[Crim. No. 2921. First Dist., Div. One. Dec. 28, 1953.]

THE PEOPLE, Respondent, v. DAVID O. GORGOL, Appellant.

Marvin E. Lewis for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Charles E. McClung, Deputy Attorney General, for Respondent.

BRAY, J.—Defendant was charged with (count I) violation of section 211, Penal Code, robbery, and (count II) violation of section 217, Penal Code, assault with intent to commit murder. A jury found him guilty of the robbery charge, determined to be first degree, and of assault with a deadly weapon, an offense included within the count II charge. Defendant appeals from the judgment of conviction and from an order denying a new trial.

### QUESTIONS PRESENTED

1. Were plaintiff's Exhibits 8 and 9 (certain portions of the hospital records) admissible under sections 1953e-h, Code of Civil Procedure (Uniform Business Records as Evidence Act)?

2. Was evidence of defendant's financial condition admissible?

3. Alleged error in striking answer of witness Quigg.

4. Alleged improper cross-examination of defendant's character witnesses.

5. Alleged misconduct of the district attorney.

6. Refusal of instruction on misfortune.

7. Alleged abuse of discretion in denying new trial.

## EVIDENCE

Defendant originally pleaded not guilty and not guilty by reason of insanity. Prior to trial the court appointed two alienists to examine defendant as to "his insanity." Their report found him sane. After conviction defendant withdrew his plea of not guilty by reason of insanity. At the trial the main issue was defendant's mental state at the time of the alleged crimes, defendant attempting to prove a mental state covering complete blackout, irresistible impulse, and lack of specific intent. While, of course, we must take the evidence and the reasonable inferences therefrom most favorable to the verdicts, it is advisable, to get the feel of the case, to set forth the factual evidence as it came to the jury. Most of the evidence concerned defendant's mental state. The reporter's transcript contains 1,475 pages, of which 98 pages covered plaintiff's case in chief.

Joseph H. Falkowich, a taxi driver, testified that he was hailed by defendant in the San Francisco Presidio at the bus station at approximately 11:45 p. m. Defendant was wearing his United States Army captain's uniform on which there were rows of ribbons. Defendant asked to be taken to the 2500 block on Webster Street on top of the hill. Defendant got into the front seat. There was no conversation. When the cab neared the designated block defendant said to pull in. The driver did so and on reaching over to clear the meter noticed defendant holding a revolver on his lap in his right hand, pointed at the driver. Defendant then stated, "I hate to do this," but that he wanted some money. The driver gave defendant all the money he had, $25. Defendant took the money in his left hand, still holding the gun in his right. Defendant appeared to not want to get out of the cab so the driver asked either that defendant get out or let him get out. Defendant then said, "You won't get hurt, just go to the corner and turn right." Defendant said that probably the radio was on and the taxicab people would know that the driver was being held up. The driver assured him there was no radio in the car. The driver started up the car and from then on kept begging defendant not to

harm him but let him "take off" as he had a wife and two children. Defendant said nothing except to tell the driver to turn to the right when they got to the corner and then to pull in to the curb when they neared Fillmore Street. The cab stopped. Defendant just sat looking at the driver who was trying to convince defendant to let him go. Finally defendant stated, "I am sorry. I will have to put you to sleep." All this time the gun was held by defendant in his lap. The gun then went off. The driver, thinking himself shot, opened the door and ran. He saw a car coming. He ran in front of it. When it stopped he told its driver he had been shot and asked to be taken to a hospital. While getting in this car, he noticed that defendant was now on the driver's side outside the cab opening the door to get into the driver's seat. At the hospital it was found that the bullet pierced the driver's sweater and shirt pocket but had lodged in a cigarette lighter in his shirt pocket. Other than a bruise, he was not hurt.

Plaintiff's next witness was John Quigg, an agent of the Sixth Army, Criminal Investigation Division. The next morning after the shooting he found a revolver hidden under the cover in a drainage ditch located about 10 feet from defendant's room at Letterman General Hospital. It contained five live bullets and an empty cartridge. That afternoon defendant was placed in a line-up with four other captains, all dressed in the same manner as defendant (defendant had taken all his ribbons off his coat that morning). Falkowich identified defendant as the one who had shot him. Lieutenant Lee of the San Francisco Police Department questioned defendant in Quigg's presence. Defendant denied committing the crimes, stating that the evening before he had been to a show, returned to his room, then went out for a cup of coffee and returned. Defendant knew nothing whatever about the incident in question. He stated he owned a revolver which was in his clothing locker at the hospital. When Lee informed him his gun had been found and that his story appeared to have certain loopholes, defendant changed his story. He stated that he had hailed the cab, got in and told the driver he wanted to go to the 2500 Webster Street block; that "he pulled a gun from beneath his coat and asked the cabbie for his money, and that the cabbie kept whimpering and whining about the situation; that finally he told the cabbie he was going to have to put him to sleep. He said that the next thing he knew he had shot the cabbie, and that he got

out of the cab and ran, so did the cabbie . . . and decided that he had better get out of there as fast as he could,'' so he got into the cab, drove towards the Presidio and left it. On the way to his room he hid the gun in what he called a culvert.

Lieutenant Lee then testified substantially as did Quigg. In more detail, he gave what defendant stated were his movements the preceding night. Even after Lee told defendant of evidence against him he still insisted his statement was correct; also he had not seen his gun for some time but believed it to be in his locker. When told that Lee had the gun and would have a ballistics test made to see if a test shot would compare with the bullet recovered from the driver, defendant then said, ''Yes, I robbed him and I shot him.'' He further stated that after he had gotten the money from the driver, the latter was doing a lot of whining, pleading and crying, and ''I said to him, 'I will have to put you to sleep' . . . then I shot him.''

Plaintiff then called a police stenographer who read a statement taken from defendant the afternoon following the shooting at the office of the robbery detail. Defendant stated that about 11:30 p. m. he dressed and left his room to get a cup of coffee. He met some M. P.'s, talked to them, ''got restless and went back and got the gun'' from a culvert in back of the ward. He flagged a taxi, telling the driver to drive him to the top of the hill on Webster Street, the 2500 block. When they stopped there was when he drew the gun. The driver ''surrendered'' the money. Defendant made no demands. The driver saw the gun when he leaned over to switch off the meter. Defendant had the gun pointing at the driver. The latter was pleading, requesting defendant to let him go. He had a wife and family. Defendant told him to start driving again, then to turn right. The driver was afraid defendant was going to do him bodily harm. Defendant told him to pull in to the curb. The driver continued his plea. ''To gain sufficient time to get him out of there, I told him I was going to put him to sleep for a little while . . . I meant to hit him. He turned to the right and backed into the corner of the seat . . . I don't know whether he moved or whether I moved or what, but I shot.'' The driver went out the left door, defendant out the right. The driver ran to the rear, calling for the police. Defendant ran to the front. As he reached the corner a car came towards him. He ran back to the taxi, pushed it to the corner, got

in and drove it to about a block from the hospital. On his way to his room, defendant ditched the gun in the culvert. When asked how much money the driver gave him defendant said, "He handed me a wad. I counted it later. It consisted of two fives, and fifteen one dollar bills." Ten one-dollar bills defendant put in his shaving kit. The other bills he put in his pocket. The gun would not work on double action but would on single action. He concealed it in the culvert because it was contrary to hospital regulations to have it. "Q. Why did you come back and get the gun? A. I don't know. The same reason why I couldn't stay in the ward in the first place. Worried and couldn't sleep. Worried about money matters. Q. What was your motive in getting the gun from the culvert? A. To go out and get money. Q. By robbery? A. If necessary, yes." Plaintiff rested.

Defendant was his own first witness. He testified at length about physical injuries, particularly to his head, which he had received during and since childhood, his fondness for guns and hunting, his army service and experience, particularly his work as a night fighter during hostilities, the circumstances under which he received his many medals, the many times he had suddenly become unconscious (blacked out), the wounds he had received, and the number of hospitals he had been in. Although he had a severe headache condition for many years, it was in March, 1951, that he first started getting hospitalization for it. He was in the neuro-psychiatric ward at Letterman from May, 1951, to March, 1952. (The shooting occurred January 11, 1952.) His headaches got worse at night, and he disliked being confined at night. Hence he was in the habit of leaving his room and going into some quiet neighborhood where he could see the city, just sit and sometimes go to sleep. His favorite place was a park at the top of the hill. He would have a feeling of frustration knowing that he had to do something, but not what. When he got up on a hill where he could see he felt better. Occasionally he would take a cab to get there. The 2500 block on Webster was one of the places he went to. In August, 1951, a friend in Kennewick, Washington, gave him the gun and a box of ammunition for it and asked him to have the gun fixed. He took it to gunsmiths in San Francisco but they could not fix it. He kept it in the wall locker of the ward, but because of his roommate he put it outside in the culvert. When he had the irresistible impulse to go to the top of the hill he always carried the gun with him,

as it was not safe to leave it behind with "a bunch of psychos" and "secondly it was more or less habit." He kept bullets in it because "my ideas are that the gun should always be loaded." Because of the condition of the gun, usually he would have to pull the trigger eight to ten times before the cylinder would line up with the bullet and the gun would fire. On the night in question defendant had the usual headache. He went to a movie with his roommate. They got back about 10 or 10:30. They went to bed. Defendant could not sleep, got up, dressed, and went out for a cup of coffee. The coffee shop was closed. He talked to some M. P.'s for a while, then, because he was scheduled to leave the hospital the next day for Texas for general duty and could not very well take the gun out of the culvert in daylight, and because it was dirty and needed cleaning, he picked up the gun. He started up the stairs to his ward but still did not feel like going in, so he walked up where the M. P.'s were, went beyond them about a block and saw the taxi coming. He was restless and knew he had to get out of there. He told the driver he wanted to go up on the hill, the 2500 block on Webster. He got into the front seat, where he usually rides. He had never mentioned this particular address to a cab driver before. When he got in the cab, he had the gun inside of the jacket and trousers, at the top of the latter. The gun started to gouge. After a block or two he took the gun out, unbuttoning his coat and then buttoning it again. He held the gun in his lap. At no time did he intend shooting. At the 2500 block he told the driver to pull in to the curb. The driver did so and leaned over to turn off the meter. He saw the gun, straightened up as if bitten by a snake. He started making loud statements. He reached in his pocket and pulled out his money, holding it out in both hands. Defendant did not ask him for any money. Defendant did not recall saying "I hate to do this." Defendant did not take any money from him. Defendant did not know what the driver did with the money, except that later defendant saw it on the cab floor. Defendant was befuddled. He realized he just could not sit there, so he told the driver to drive. When they neared the corner he told the driver to turn right because that was back toward the hospital. The driver was talking continuously in a loud, urgent, whining voice. Defendant thinks the driver was crying, pleading, telling about his wife and children. This made defendant wish he would shut up.

It was giving defendant a headache and his head was like a bell ringing "and the vibration works in." The cab was crawling. Defendant told the driver to pull over and stop. Defendant sat for a while and did not know what to do. He wanted to get back to the hospital. He decided he was going to have to shut the driver up and the best way would be to put him to sleep. Defendant was going to render him unconscious by hitting him over the head with the gun so that defendant could get back to the ward undetected, but he was not going to shoot him. While defendant has no recollection of pulling the trigger, "I recall hearing that gun go off." He remembered no outstanding thing a split second before he heard the gun go off. "It was just he [the driver] was talking." Defendant thought he was more frightened than the driver was. Defendant opened the right door and ran. At the corner a car was coming towards him. He stopped and watched it go. The driver was standing a block away, standing in the path of the other car. The car stopped and the driver got in. Defendant went back to the cab, got in and sat there. The motor stalled, so defendant pushed it to the grade at the corner, put it in gear and drove it to a block from the Presidio. There he saw the money on the floor, picked it up, put it in his pocket, hid the gun in the culvert and went to bed, taking medication to make him sleep. The next morning he took all the ribbons off his jacket as he did not intend to wear the jacket. Defendant admitted telling Quigg and Lee that he intended to rob the cab driver. Defendant admitted that in all his hospital experience prior to the shooting he never told any Army medical officer anything about his alleged periods of unconsciousness. Defendant related that one morning after his arrest while driving his car he became unconscious and the car struck a pole.

On cross-examination, when asked if at any time during the incidents the night of the shooting he was unconscious at all, he replied, "I didn't have one of the regular." He was then asked, "I mean, you knew everything that was going on that night, didn't you? A. More or less, yes." He recalled in detail practically everything that occurred during the cab ride. While he recalled intending to put the driver to sleep because of his whining by hitting him with the gun, and recalled hearing the shot, the only thing he claimed not to recall was pulling the trigger and in a rather indefinite way he claimed not to remember asking for the

driver's money. When asked about his statements to Quigg and Lee he stated, "I refused to make any statement until they produced the evidence." There was evidence that one day on his way to the trial defendant had blacked out while getting on a bus.

Mrs. Gorgol corroborated defendant as to certain of the incidents when he became unconscious and the development of his headaches, change of personality and other matters bearing upon his state of mind.

Two Army captains likewise testified to matters bearing on defendant's mental state. A gunsmith testified to the defective condition of the gun. Two psychiatrists and neurologists testified to the effect that defendant suffered from wanderlust epilepsy or epilepsy equivalent. This type of epilepsy is one in which it is very common for the subject to have an urge to leave his home or place of business. He is driven by the subconscious mind to do certain things and perform certain acts and is an automaton governed entirely by the subconscious mind. A common symptom of this epilepsy is the commission of robbery and other major crimes. In their opinion defendant was unable to and did not form an intention either to rob the driver or do him harm. An epileptic of this type could lose consciousness for a split second and yet remember everything which occurred except what happened in that split second. He would not even know that he had had the unconsciousness. In effect defendant's actions the night of the shooting were characteristic of defendant's epilepsy. Experts called by plaintiff gave opinions contrary to those of defendant's experts.

1. *Hospital Records.*

Defendant contends that plaintiff's exhibits 8 and 9 were erroneously admitted into evidence, first, because no proper foundation was laid for them, and secondly, because they contained hearsay and conclusions. These two exhibits were a part of the Letterman Hospital records. Defendant had subpoenaed the Letterman Hospital records. Defendant interrupted the cross-examination of defendant, stating that he had just noticed the custodian of those records to be present. Without calling the custodian, defendant asked that they be marked for identification. They were marked defendant's Exhibit B for identification. Thereafter they were first considered on the cross-examination of Dr. Tuchler, defendant's alienist, who had testified he had examined the

Letterman records before making his diagnosis. The plaintiff asked him if he was familiar with the report (later admitted as plaintiff's Exhibit 8) of December 31, 1951, by Captain Prest of the Medical Corps, and offered to show it to the witness. Defendant objected on the ground that it was not a part of the medical record because it went beyond the question of medical examination. He also stated that he was sure it was not part of the official file from Letterman which he had introduced for identification, and wanted an opportunity to examine the file to see if it was. The matter was dropped when the doctor testified he had not seen the report.

The next mention of the hospital records came when defendant showed the witness an electro-encephalographic report of June 8, 1951, which defendant stated was part of the Letterman records, and started reading from it. Plaintiff objected on the ground the record was not in evidence. Defendant stated he proposed showing the witness parts of these records. The court asked if the records were going to be admitted. Plaintiff said it wanted to examine them first. Defendant again stated he wanted to examine the witness on his interpretation of the records upon which he relied. Thereupon the court said that if the doctor relied upon certain portions of the records, the records should be in evidence. Defendant said he only wanted portions of them and if the prosecution wanted other portions, it could offer them if legally admissible. Defendant then read to the doctor the record of an electro-encephalographic examination and the conclusion therefrom, by whom made does not appear, and asked the witness to interpret it. Thereafter, defendant read into evidence the final summary, Ward 26, dated January 4, 1952, after asking the witness if he had seen it and used it. This report covers about three pages of the transcript, and gives defendant's history of injuries, complaints and treatment since admission to Letterman May 11, 1951.

The next use of any of the hospital records was by defendant in examining plaintiff's witness Colonel Clausen, a medical doctor and senior resident physician at Letterman. Defendant, after asking the witness if it was a record of Letterman, read into evidence a final summary made by Captain Hood, the doctor to whom Colonel Clausen had referred defendant for treatment. Defendant asked Colonel Clausen if he had seen the records subpoenaed by defendant and if they were all of the Letterman records in defendant's case. The witness stated they did not include the outpatient clinic records. De-

fendant then showed him the clinical outpatient record of defendant and asked if the witness recognized it as the official record of the hospital. The witness replied that it was. Plaintiff objected to its introduction, contending that all the records should go in or none. Considerable argument took place then and later, plaintiff contending that all the records should go in, defendant contending only portions of them were admissible. At one time plaintiff offered them all. Defendant did not object on the ground of lack of foundation but on the ground that portions of them were inadmissible because he contended they were either hearsay or conclusions. For some reason not apparent the court did not rule on the offer of all of the records.

Defendant over plaintiff's objection read into evidence a report and diagnosis by Dr. Feeney, after first asking Colonel Clausen if it was an official record of Letterman, also a report dated February 28, 1952, to which plaintiff objected on the ground that it was only in for identification. Defendant then asked if it was "a portion of the medical record from Letterman Hospital under your supervision?" The witness stated it was. Plaintiff further objected on the ground that it was identically the same type of record as the Captain Prest report (later Exhibit 8) to which defendant had previously objected, making the same objections defendant had made. Considerable discussion followed and the court said, "I will allow this [referring to the record defendant wanted in], but if I do, then I am going to allow the other one, too . . ." (referring to the Captain Prest report, later Exhibit 8). Defendant insisted upon the report going in. The court admitted it and defendant read it into evidence. Defendant also read into evidence the record of several electro-encephalograms and the diagnoses therefrom, after asking Colonel Clausen if they were official Letterman records. Defendant asked Colonel Clausen if the medical records in court were the official records of Letterman and he replied that they were. On redirect examination of Colonel Clausen plaintiff asked him if the documents, plaintiff's Exhibits 8 and 9, were official records of Letterman. These two records were not in those included in defendant's Exhibit B for identification. They were separately identified. He stated they were. Defendant objected to their introduction on the ground that they contained hearsay, conclusions and improper statements. The court admitted them. An examination of the transcript shows that throughout the trial both side and the court assumed that

the Letterman records had been sufficiently identified and were available to either party to use, except that plaintiff kept insisting that the whole record should be introduced and the defendant kept insisting that he only was required to offer such portions as he desired, and that many portions of the record were inadmissible because hearsay, improper and conclusions. In *Hunton* v. *California Portland Cement Co.*, 50 Cal.App.2d 684, 696 [123 P.2d 947], it was held that a party cannot complain of the exclusion of evidence offered by himself, where he has successfully objected to the admission of evidence of the same character offered by the adverse party. Here the converse of that occurred. ▮ The court ruled in accordance with defendant's theory on the admission of records offered by him. Therefore he cannot complain of the admission on the same theory of records offered by plaintiff.

Exhibit 8 is certified as a true copy by one Gess, Captain, Medical Service Corps, Commanding. It is a report dated December 10, 1951, signed by Captain Prest, Medical Corps. It states: "This 29 year old officer was seen at the request of the Commanding Officer, Medical Holding Detachment, for evaluation prior to proposed action under AR605-200 for alleged failure to properly meet personal financial obligations. According to the information the individual offered both myself and the social worker, his debts would appear to be concerned with the purchase of an automobile, household furnishings, and indebtedness necessitated by change of situation which did not authorize movement of family and household effects. According to the patient's statements these outstanding debts are now being met according to prior agreement and his present administrative difficulties stem from his being on leave during which time payment fell due and his inability to meet this payment until his return from leave. This individual has no psychiatric complaints. He is at present hospitalized on the Neurological Service with the diagnosis of migraine headaches, improved, and it is felt that he is ready for return to duty. He is a youthful appearing individual who is friendly and outgoing in his manner relating well in the interviews situation. Affect is appropriate to content. Speech is logical, relevant, and coherent. There is no abnormal content elicited nor are there any evidences of gross disturbance of mentation. Past history taken from the patient's statements indicate no clear evidences of psychological disturbance, either in his family history, work record, or in the area of his marriage and other inter-personal relationships.

While there is considerable evidence of immature attitudes and poor judgment concerning his financial affairs, this by itself does not constitute psychological illness and psychiatric clearance is given.''

Exhibit 9 is a copy certified by Tiffany, a Major, Medical Corps, Assistant Chief, Neurology Section, of a report by Arthur J. Levens, Lieutenant Colonel, Medical Corps, with whom Colonel Clausen had made an appointment for defendant. Colonel Clausen identified it is an official hospital record. It reads: ''7 Oct. 52: This 30 year old white male comes to Neurology Clinic without any specific consultation request, but it is understood that the patient had some type of episode in which he had a car accident. He was seen in Out-Patient Clinic where the possibility of pneumoencephalography was considered. At that time it was understood that the physician considering this procedure was not aware that a pneumoencephalogram had been done in the past. This patient, it is understood, is still being investigated in connection with an assault upon a taxi cab driver. Neurological examination reveals no significant neurological abnormality. The patient is found to be somewhat tense and sufficient abdominal relaxation is unobtainable so that the abdominal reflexes could not be elicited. Impression: Patient makes some vague reference to headaches which start in the posterior cervical area, and in view of the general picture of tension believe that the patient has a mild tension state which could be well founded on his present predicament. He has been told by a civilian neurologist that he might have a fugue state of which I am personally very skeptical. I believe that the patient may be endeavoring to manipulate his way into the hospital in order to strengthen his defense. I think this patient should be kept out of the hospital. Pneumoencephalography at this point, in view of negative neurological findings and previous pneumonencephalogram, should not be done.''

The Uniform Business Records as Evidence Act (Code Civ. Proc., §§ 1953e-1953h) in section 1953e defines the term ''business'' as used in the act in such manner as would include the Letterman General Hospital. Section 1953f provides: ''A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identitfy and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information,

method and time of preparation were such as to justify its admission.''

Formerly, the rule concerning business records was very strict. However, it was found that under modern business methods such rule had become archaic. In 1927 a committee sponsored by the Commonwealth Fund of New York published a model act for ''Proof of Business Transactions.'' (5 Wigmore, Evidence, 3d ed. § 1520, p. 361.) This act was designed to permit the admission in evidence of any record or memorandum of any act, event, transaction or occurrence, provided only that the record was made at or near the time of the event, and that the making of such a record was in the regular course of business. This act was adopted by New York and six other states as well as in the United States Code. Then, in 1933, the Committee on Evidence Acts of the National Conference of Commissioners on Uniform State Laws drew up a Uniform Act on Business Records which after revision was adopted in 1936 by the Conference. This act has been adopted in 13 states including California and in Hawaii in preference to the first mentioned act. The principal difference between the two acts is that the later act expressly gives discretion to the courts to determine whether admission of the record is justified by the circumstances under which it is made. It is based on the recognition that records made and relied upon in the regular course of business may be regarded as trustworthy without verification by all the persons who contribute to them. (See 48 Columb.L.Rev. 922.) While in other states the act in its relation to hospital records has been variously applied, in California cases it has uniformly been given a liberal interpretation. In *Loper* v. *Morrison*, 23 Cal.2d 600 [145 P.2d 1], the trial court had excluded from the evidence a portion of a hospital chart called a ''nurses' record'' which contained entries by nurses relative to the plaintiff's condition while in the hospital. It was offered to refute the plaintiff's evidence that the plaintiff while there suffered from headaches, bruises and sore spots. was nervous and hysterical and was given pills to help her sleep. Concerning the Uniform Business Records as Evidence Act the court said (p. 608) : ''The purpose of this act is to enlarge the operation of the business records exception to the hearsay evidence rule. . . . The business entry statutes are not limited to entries in commercial enterprises, and hospital records are properly included within their operation. [Citations.] There is no reason to believe that

a hospital record is not as truthful as a record kept by a commercial firm. It is a record upon which treatment of the patient is based, and experience has shown it to be reliable and trustworthy. [Citation.] It is the object of the business records statutes to eliminate the necessity of calling each witness, and to substitute the record of the transaction or event. It is not necessary that the person making the entry have personal knowledge of the transaction." However, the court declined to determine whether the proper foundation for the admission of the record had been laid for the reason that, because the record supported rather than refuted the plaintiff's evidence, it held that no prejudice resulted if the exclusion were error.

In *Gunter* v. *Claggett*, 65 Cal.App.2d 636 [151 P.2d 271], an official naval form signed by the officer in charge of the San Francisco Navy Recruiting Station stating that the plaintiff had been discharged from the United States Naval Reserve and was not recommended for reenlistment by reason of certain "disqualifying defects" (p. 643) consisting of enumerated physical infirmities, was admitted over the objection that it was hearsay. In holding there was no merit to this objection the court said the certificate was admissible under the act.

In *McDowd* v. *Pig'n Whistle Corp.*, 26 Cal.2d 696 [160 P.2d 797], it was contended that the hospital record covering the plaintiff's stay was improper for use in showing the diagnosis of the plaintiff's condition and the nature and extent of her injuries. After holding that a proper foundation had been laid the court said its admission was proper as "It was made in the regular course of business of the hospital and contained matters customarily contained in such records." (P. 700.) Concerning the Loper case, *supra*, 23 Cal.2d 600, the court said (p. 701): "In the instant case a proper foundation was laid and the Loper case clearly held the records admissible in such event. The Loper case has since been followed. (*Gunter* v. *Claggett*, 65 Cal.App.2d 636 [151 P.2d 271].) (See, also, *Ulm* v. *Moore-McCormack Lines*, 115 F.2d 492, rhg. denied 117 F.2d 222; *Reed* v. *Order of United Commercial Travelers*, 123 F.2d 252; and *Gile* v. *Hudnutt*, 279 Mich. 358 [272 N.W. 706].)"

In *Pruett* v. *Burr*, 118 Cal.App.2d 188 [257 P.2d 690], the court was not considering hospital records. There the defendants were charged with spraying the plaintiff's cotton with a spray containing certain deleterious chemicals. Letters

indicating that certain tests were made by the State Department of Agriculture and Bureau of Chemistry showing the presence in the spray of these chemicals, were admitted. The court held that these letters were not public records or official documents and were not shown to be records which a public officer was required to keep or make, nor, if official documents, were they shown to be kept as part of the regular function of the particular office. The court further stated (p. 230): "We do not believe that it was the intent of the act to make all correspondence received by a businessman admissible in evidence merely because it might pertain to his business." Obviously this case is not in point concerning hospital records. Nor is *Harrigan* v. *Chaperon,* 118 Cal.App.2d 167 [257 P.2d 716], concerning rumors set forth in a fire department record.

In *McGowan* v. *City of Los Angeles,* 100 Cal.App.2d 386 [223 P.2d 862, 21 A.L.R.2d 1206], in upholding the rejection of a "blood alcohol determination" on the ground that there was no showing that the blood tested was that of the person in question, the court pointed out that under section 1953f, Code of Civil Procedure, "Patently the court had discretion to determine whether the paper was relevant and whether 'the sources of information, method and time of preparation were such as to justify' the admission of the coroner's record."

In *Nichols* v. *McCoy,* 38 Cal.2d 447 [240 P.2d 569], the court upheld the introduction into evidence of the coroner's record of a test made of the decedent for alcohol. It distinguished the McGowan case, *supra,* on the ground that there (p. 449) "it was the opinion of the trial court that the sources of information, method and time of preparation of the record in question were not such as to justify its admission." In the Nichols case the court held that even the identity of the source of the blood could be proved by the record, and that the result of the tests could be proved by the record even though the person making the tests did not appear. Two of the Supreme Court justices dissented.

Professor Hale in 14 Southern California Law Review 99, discusses the admissibility of hospital records under the act. He points out that while throughout the country there is a definite cleavage of judicial opinion on the question of the admissibility of hospital records, some jurisdictions holding them to be inadmissible because hearsay, while others hold them admissible as exceptions to the hearsay rule, the general tendency is towards liberality in holding them admissible. In

determining what constitutes hospital records he sets forth the following from the Manual of Hospital Standardization adopted by the American College of Surgeons and the American Medical Association: ''That accurate and complete medical records be written for all patients and filed in an accessible manner in the hospital, a complete medical record being one which includes identification data; complaint; personal and family history; history of present illness; physical examination; special examinations, such as consultations, clinical laboratory, x-ray and other examinations; provisional or working diagnosis; medical or surgical treatments; gross and microscopical pathological findings, progress notes; final diagnosis; condition on discharge; follow-up and, in case of death, autopsy findings.'' He analyzes many cases on the subject (most of which, however, are prior to the preparation of the Uniform Act) and concludes: ''It seems entirely fair to say that the use of hospital records to prove all of the matters regularly entered and which are within the personal knowledge of persons engaged in carrying on the hospital service involves no radical departure from established precedent in the field of regular business entries. Such precedents cover a wide range. It is no far cry from repairs made in a garage to repairs made in a hospital. The practice should be liberal in dispensing with the calling of the various persons engaged in the chain of services and recording. In the authentication of the records, it normally should suffice to call the chief registrar or the superintendent of the hospital. Even if numerous individuals are called, our chief reliance is upon the records and the force of the system which produces them, not upon independent recollection of nurses, internes and doctors. Though statutes may speed development, the way of progress lies open within the framework of the common law.''

''The medical records of patients at a hospital, organized on the usual modern plan, deserve to be placed under the present principle [exception to the hearsay rule]. They should be admissible, either on identification of the original by the keeper, or on offer of a certified or sworn copy. There is a Necessity (ante, § 1421); the calling of all of the individual attendant physicians and nurses who have cooperated to make the record even of a single patient would be a serious interference with convenience of hospital management. There is a Circumstantial Guarantee of Trustworthiness (ante, § 1422); for the records are made and relied upon in affairs of life and death. Moreover, amidst the day-to-day details of

scores of hospital cases, the physicians and nurses can ordinarily recall from actual memory few or none of the specific data entered; they themselves rely upon the record of their own action; hence, to call them to the stand would ordinarily add little or nothing to the information furnished by the record alone. The occasional errors and omissions, occurring in the routine work of a large staff, are no more an obstacle to the general trustworthiness of such records than are the errors of witnesses on the stand. And the power of the Court to summon for examination the members of the recording staff is a sufficient corrective, where it seems to be needed and a bona fide dispute exists.'' (6 Wigmore on Evidence, 3d ed., § 1707, p. 36.)

In *People* v. *King*, 104 Cal.App.2d 298 [231 P.2d 156], the court stated (p. 309): ''It clearly appears from the record that all of the records were made in the regular course of the business of the hospital and that they were made at or near the times of the various acts recorded. While it may be that there frequently are some things recorded on a hospital chart that in a strict sense may not be admissible, such items can be excluded therefrom upon the making of a proper objection, or appropriate instructions may be offered covering such items. Here the only objection was that the records were secondary evidence, which was not a good objection in view of the 'Uniform Business Records as Evidence Act.' ''

Volume 48, Columbia Law Review, 920, 929, states: ''The vast majority of courts readily admit not only routine observations by medical personnel in a hospital record but also diagnoses of a patient's physical or mental condition.''

█ Summing up the conclusions of the courts, including our own, which have adopted the more liberal view of the act (incidentally those courts are in the majority), the ruling as to the admissibility of hospital records seems to be that if a proper foundation is laid, the fact that the records are hearsay and that the particular nurse, doctor or person making the record has not been called, does not preclude their admission. Nor does the fact that they contain inadmissible matter prevent their admission. Such parts should be omitted or proper instruction of the court given concerning them. Admissible matter seems to be such matter as is customarily contained in a hospital record, for example, the data required by the above mentioned Hospital Manual, and such matter as would be admissible were the person making the record present in court. The foundation is properly laid ''if, in the

opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." (Code Civ. Proc., § 1953f.)

This brings us to the records in question. As to foundation, while there was no detailed testimony as to the mode of preparation (which in *Luthringer* v. *Moore,* 31 Cal.2d 489 [190 P.2d 1], caused rejection of hospital records), the assumption by all concerned that they were properly prepared, the use of them by the defendant, the testimony of the Army doctors concerning them, and all of the circumstances connected with them, supported the court's determination that their sources of information, method and time of preparation were such as to justify their admission.

The most serious question that arises concerns the admissibility of certain statements in them. All of the data in Exhibit 8, including the diagnoses, except the references to defendant's debts and financial condition, obviously comes within the recognized records of a hospital. In the above mentioned rules governing standardized hospitals appears the following:

"2. Complaint. The patient's statement of reasons, signs and symptoms for seeking medical aid. . . .

"4. Past history. A summary of the patient's life in relation to pathology, illness, with or without complications, operations and injuries, *habits, social condition, environment, and any data which may be related to the present illness.*" (Emphasis added.)

This report gives as the reason defendant was in the hospital, "alleged failure to proprely meet personal financial obligations." This fact plus the information which he himself gave concerning his debts are all data required by the above rules 2 and 4. Moreover, they bear on the diagnosis given that although defendant had an immature attitude towards his financial affairs, it did not constitute psychological illness. Moreover, Colonel Clausen, when read this very clause, testified that defendant's financial situation which the doctor obtained both from the record and from the defendant himself, was one of the things considered by him in arriving at his opinion of defendant's mental condition. Defendant contended he was in the hospital because of his mental condition due to battle fatigue and other causes associated with his Army service. This opened the door to expert opinion as to whether he was psychologically ill or only worried about his debts. Had Captain Prest, the doctor who made the diagnosis

in Exhibit 8, been on the stand, he could have testified as did Colonel Clausen to the latter situation. Exhibit 9 gives as the reason for defendant being in the hospital a car accident. Except for the statement ''I believe that the patient may be endeavoring to manipulate his way into the hospital in order to strengthen his defense,'' all the other data is that customarily found in hospital records. Had Colonel Levens, the doctor who made this record, been on the stand he could have been asked if in his opinion defendant was feigning or malingering. (See Gray, Attorneys' Textbook of Medicine, 2d ed., ch. 12, p. 303; also cases collected 97 A.L.R. 1284, and 20 Am.Jur. 735.) If defendant was malingering while in the hospital during the pendency of this case, the jury would have no option but to determine it was ''in order to strengthen his defense.'' While the doctor would not have been permitted to use this particular language in describing defendant as malingering, we can see no prejudice under the circumstances in the language used.

2. *Defendant's Financial Condition*

As we have heretofore shown, defendant's financial condition as testified to by Colonel Clausen and as shown by the hospital records was admissible as part of the basis for the medical diagnosis. Colonel Clausen testified that in arriving at his opinion he considered that defendant was having financial difficulties, and that he had cosigned a note for defendant. Defendant did not ask that the fact of cosigning the note be stricken from the record; he merely objected to Colonel Clausen's conclusion as to defendant's financial difficulties. Defendant now assigns error as to the statement about the note. As defendant did not object, he cannot raise the point now. As to the objection he did make the record shows that Colonel Clausen was stating what he had been told by defendant, and hence would have been an admission.

The district attorney asked defendant concerning his financial condition, bringing out that defendant owed $1,500, and that he needed money to take his family to Fort Bliss to which he had been transferred (no objection was made to this line of questioning, although later defendant made a motion to strike it) and that apparently the day after the robbery he did not have any money other than the $25 he had taken from the driver, $15 of which was concealed in defendant's hat band and $10 in his shaving kit. The district attorney also produced evidence that two days before defendant had stolen his roommate's wallet. This wallet was

found hidden in the culvert with defendant's gun. Defendant contends that this evidence was inadmissible.

Dr. Brown, the Clinical Director of Psychiatry at the San Francisco City and County Hospital, testified that he examined defendant in January, 1952 (defendant was sent there for examination as to his sanity by a judge of the municipal court), and that when he asked defendant why he shot the driver defendant replied: "I don't know. I can see some reason for holding him up. I was in financial difficulties." In his statement to the police the day after the shooting, when asked why when he left his room to get coffee he came back and got his gun, he replied: "A. I don't know. The same reason why I couldn't stay in the ward in the first place. Worried and couldn't sleep. *Worried about money matters.* Q. What was your motive in getting the gun from the culvert? A. To go out and get money. Q. By robbery? A. If necessary, yes." (Emphasis added.) On the stand defendant stated that he doubted that he asked the driver for money. "I didn't want it, *I had no use for it.*" (Emphasis added.) He was then asked if he was not in financial difficulties at the time. He replied "Yes, and no," and then admitted that he was $1,500 in debt. Defendant then claimed that the next day he was to receive his pay of $500 and that accordingly he would not have any use for such a small sum of money as he would be likely to get from a cab driver. His defense additionally was that he did not have the requisite intent to commit robbery and that the driver had handed over the money voluntarily under the mistaken belief that defendant was attempting to rob him. In view of the foregoing, defendant's financial condition and the fact that he had actually stolen his roommate's wallet were relevant as bearing on his story that the driver voluntarily gave him the money and that defendant had no intent to deprive the driver of it. ■ Evidence of another unlawful act is admissible to establish motive, knowledge or intent. (*People* v. *Peete,* 28 Cal.2d 306 [169 P.2d 924]; *People* v. *Burns,* 109 Cal.App. 2d 524 [241 P.2d 308].) ■ Ordinarily the lack of money by a defendant is not admissible in a robbery charge, for the reason that the practical result of permitting proof of it would be to put a poor person under a relative disadvantage. (2 Wigmore, Evidence, 3d ed., § 392, p. 341; *People* v. *Kelly,* 132 Cal. 430 [64 P. 563].) Wigmore weakens this rule by saying: "Nevertheless in cases of merely peculative crime (such as larceny or emblezzlement) . . . the fact that he was

in need of it [money] at the time is decidedly relevant to show a probable desire to obtain it and therefore a probable . . . purloining; and there is here not the same objection from the standpoint of possible Unfair Prejudice." (2 Wigmore, Evidence, 3d ed., § 392, p. 342.)

There are, however, exceptions to that rule. For example, it may be shown that prior to the date of the alleged crime the defendant was without money and immediately thereafter he had a large amount of money. (*People* v. *Kelly, supra*, 132 Cal. 430; *People* v. *Orloff*, 65 Cal.App.2d 614 [151 P.2d 288].) Another exception appears in *People* v. *Richards*, 74 Cal.App.2d 279 [168 P.2d 435], where evidence was held admissible to show that prior to the robbery the defendant had made a down payment on an automobile and was required to make subsequent payments on it, that he was not working and had no finances with which to meet the obligation. ". . . it was for the jury to determine whether his pecuniary situation tended to directly connect him with the commission of the crime or to disclose a motive for its commission." (P. 290.) The court stated further (p. 289): "As stated by the trial court, 'if it has a tendency to prove that on the 28th day of February (the date of the robbery) the defendant is in need of money, and it is a circumstance which may or may not have any weight or may or may not have any particular significance. But I think it is admissible as a circumstance.' "

■ In robbery motive constitutes no element of the crime itself; still, where circumstantial evidence is largely relied upon for conviction, motive may be inquired into. As to the assault, motive becomes important. While it is true that in our case defendant on direct examination gave no testimony as to his financial condition, it was proper cross-examination to ask him concerning his intent and concerning any matters which would refute his claim that he had not asked the driver for money. ■ Here defendant admits that he held a gun in his lap, that he ended up with the driver's money, but contends among other things that he could not have demanded the money because he did not have any need for money. Clearly evidence from which the jury could reasonably infer that he did have such need was, at least, a circumstance refuting his claim. ■ The evidence concerning defendant's financial condition and the theft of the wallet meets the test set forth in *People* v. *Burns, supra*, 109 Cal.App.2d 524, quoting from *People* v. *Peete, supra*, 28 Cal.2d 306 : "As to the

test: ' "The general tests of the admissibility of evidence in a criminal case are: . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not." ' (P. 315)." (P. 535.) The court in its instructions fully limited the application of this evidence.

### 3. *Answer of Witness Quigg.*

 Quigg testified to statements made by defendant at the Army Provost Marshal's office the day after the shooting. On cross-examination defendant tried to get Quigg to say that defendant had said he had no remembrance of shooting the gun. Quigg refused to do so. On redirect the following occurred: Question by Mr. Mayer for plaintiff: "Q. You say that he told you that the next thing he knew the gun had gone off? A. Well, his actual words, I believe, were: the next thing he knew he had shot the man. Q. The next thing he knew he had shot the man? A. In other words, he had no indication that he knew he had deliberately pulled the trigger or anything like that." Plaintiff immediately moved that this answer be stricken as the conclusion of the witness. The motion was granted. Defendant assigns this ruling as error. There was no error. It is obvious from the witness' answers both to the plaintiff and defendant thereafter that the stricken answer was the conclusion of the witness and not the statement of defendant. In defendant's recross defendant succeeded in getting the witness to state that defendant said "the next thing that he knew the gun had been fired" and that defendant never stated he remembered shooting the gun. So if there were any error it was nonprejudicial.

### 4. *Cross-examination of Character Witnesses.*

 On cross-examination of certain of defendant's character witnesses plaintiff asked if they would have changed their opinion as to defendant's reputation as to truth, honesty and veracity had they known defendant had stolen a fellow officer's wallet. One witness was asked if he had heard of the charges of robbery and assault brought against defendant. The witnesses all said that this knowledge would not have changed their belief that defendant's reputation was good. As said in *People* v. *Beltran,* 94 Cal.App.2d 197 [210 P.2d

238], "The cross-examination should not have been extended to include inquiries as to what the witnesses personally might have thought of his reputation if they had had additional information." (P. 210.) However, it was there held that the error was not prejudicial as "none of the witnesses changed his testimony, each of them maintaining respondent's reputation in the community was good." (P. 210.) Nor was the error prejudicial here, particularly as the witnesses maintained that defendant's reputation was good in spite of the matters referred to.

### 5. *Alleged Misconduct.*

 In his argument to the jury the district attorney, after calling defendant's claim that defendant blacked out due to epilepsy a sham, stated, suppose that a juror was sitting next to defendant on a street car and suddenly defendant for no reason had one of his spells and killed the juror, and then came into court claiming that he had a license to kill as he could not be held responsible for his action. He then stated that it was the jury's duty to determine whether this sickness had reached the point of insanity, if it had defendant would nevertheless be guilty, as the question of not guilty by reason of insanity was yet to be tried. Defendant made no objection to this argument, although he now assigns it as misconduct. Later, the district attorney asked the jury if, assuming his claim of blackout to be true and that, as he testified, in one blackout he had killed an Italian soldier, in another he had tried to kill his baby but was prevented by his wife from so doing, and in the third the only reason he had not killed the driver was because of the cigarette lighter, "Now, if that is the state of this man, what are you going to do? Are you going to acquit him?" Defendant then assigned this statement as misconduct, contending that if the defense of unconsciousness were proved the jury must acquit and asked that the jury be so instructed. The judge denied the motion for a mistrial and informed the jury he would later instruct them on the subject, which he did.

As to the first assignment, the district attorney was answering defendant's argument in which he reviewed the medical testimony and asked the jury to acquit defendant so that he could get medical care. The district attorney was trying to say that insanity was no defense to the action at this time. While the matters contained in the second assignment would have been better left unsaid, we can find no prejudice in view of the court's plain, repeated and forcible instructions to the

effect that if defendant acted while unconscious or without intent or was unaware of committing the acts he would have to be acquitted. A reading of the record, the many arguments between counsel, the statements of the court on rulings and particularly its clear instructions, can leave no doubt that the jury understood that if they found that defendant acted in a blackout, because of an irresistible impulse, or lacked intent, they must acquit.

During the trial and on his way to court defendant fell while trying to board a street car in what defendant contends was an epileptic blackout. Defendant appeared in court with a cut head. Trial recessed and he was taken to the emergency hospital. While there press photographers took his picture while being treated. In argument the district attorney referred to the incident of the recess and stated that counsel had rushed defendant to the emergency hospital "through the press room." Defendant cited this as misconduct. The court called attention to the fact that the emergency hospital doctor testified that the first notice he got of he injury was from somebody in the press room. While the court should have admonished the jury to disregard the statement, its failure to do so was not prejudicial.

Defendant assigns as misconduct the statement of the district attorney that defendant could not have been suffering on the night in question from an epileptic spell because he had been taking dilantin, which is an anti-convulsive drug, and had taken it the day before the shooting. Defendant objected. Considerable discussion ensued in which it was pointed out that dilantin does not positively prevent spells and that there was no evidence that defendant had taken dilantin at any particular time other than that on January 6th he had been given 100 pills for use. The misquotation of the evidence in the district attorney's argument was fully cleared up by this discussion.

6. *Instruction on Misfortune.*

The court refused to instruct on the law of misfortune (Pen. Code, § 26(6)) which gives as persons incapable of committing crimes "Persons who committed the act or made the omission charged through misfortune . . . when it appears that there was no evil design, intention, or culpable negligence." There is no evidence to support such an instruction. Defendant did not contend that he committed criminal acts through misfortune. He contended (1) that he did not commit the acts or (2) that if committed he lacked the

requisite intent, or (3) .he was not legally capable of committing criminal acts because he was unconscious.

It should be pointed out that defendant's story on the stand of what happened at the time of the robbery was directly contrary to that of the driver and to defendant's own stories given to the Army and police officers. So far as the assault is concerned, under his own statement that he threatened to put the cab driver asleep by hitting him with the gun, the assault was complete before the gun went off. Defendant does not claim to have blacked out at any time until after that. The jury by its verdict gave him the benefit of his claim that he did not intend to pull the trigger. His claim of irresistible impulse and no intent to rob are not consistent with the driver's story that he demanded money and actually did rob him, and with defendant's admission that he needed money and intended to get it by robbing the driver if necessary.

"Misfortune" when applied to a criminal act is analogous with the word "misadventure" and bears the connotation of accident while doing a lawful act. (See definitions in 27 Words and Phrases, 346.) Actually, except for the lack of the single word "misfortune," the court fully instructed the jury favorably to the defendant on all matter which defendant contends the word "misfortune" meant in this case.

7. *Denial of New Trial.*

On the motion for new trial, the affidavit of Attorney Lewis was presented stating that after the jury had presented its verdict and the judge had left the courtroom, defendant fell to the floor with an epileptic seizure. Defendant at the judge's suggestion was taken by ambulance to the Letterman Hospital. Defendant urges that the court abused its discretion in denying a new trial in view of this seizure. "The rule is established that the determination of the question whether newly discovered evidence which is cumulative evidence is of such a nature as to have produced a different result if it had been presented at the trial, rests largely in the sound discretion of the trial court, whose determination will not be disturbed on appeal in the absence of a showing of an abuse of discretion." (*People* v. *Colletta,* 100 Cal.App.2d 1, 5 [222 P.2d 922].) This was merely cumulative evidence as during the trial defendant produced evidence of many such seizures, including one during the trial. Apparently the judge felt that the evidence of one more seizure would not change

the result. We cannot find that he abused his discretion in this respect.

The judgment and order denying new trial are affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 27, 1954. Edmonds, J., did not participate therein.