[Crim. No. 7548. In Bank. Feb. 18, 1965.]

In re ALBERT LESSARD on Habeas Corpus.

Albert Lessard, in pro. per., Donald B. McCaw and Valentine C. Hammack, under appointment by the Supreme Court, and Thomas S. Harte for Petitioner.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Albert W. Harris, Jr., and Edward P. O'Brien, Deputy Attorneys General, for Respondent.

TOBRINER, J.—Petitioner seeks a writ of habeas corpus on the ground that he is imprisoned under a sentence of death in violation of rights guaranteed to him by the Fourteenth Amendment to the Constitution of the United States. A jury found petitioner guilty of first degree murder and fixed the penalty at death. We affirmed the judgment. (*People* v. *Lessard* (1962) 58 Cal.2d 447 [25 Cal.Rptr. 78, 375 P.2d 46].)

To give the factual background for the legal issues which we shall discuss in this opinion we quote in part from our former opinion: ". . . on June 15, 1959, the deceased registered at the Travel Lodge Motel in San Francisco. He had in his possession approximately $800, the proceeds of a check for his summer pay as a school teacher. On the afternoon of June 16 he met defendant in a tavern directly across the street from deceased's motel. The two had drinks and some conversation. Thereafter defendant left the tavern shortly before 6 p.m. and returned in approximately 15 minutes. The latter accompanied by the deceased then left the tavern at approximately 6:30 p.m. The deceased's body was found in his motel room the following morning. Death was caused by knife wounds in his chest and back areas. Other wounds on the deceased's arms and hands were described as of a type inflicted when one attempts to ward off a knife attack.

"Defendant's fingerprints were found throughout the deceased's motel room, and he admits to having entered the room after leaving the tavern. In addition, defendant's fingerprints were found on a knife in a display case at a restaurant supply store located in the same neighborhood as the motel and tavern. The owner of the store testified that on the afternoon in question at approximately 6 p.m. a man who might have been the defendant entered his establishment and purchased a boning knife. Before making his selection, however, the customer examined another knife which was returned to the display case. When the owner heard of the homicide he informed the police of the purchase, and it was the knife remaining in the display case on which defendant's fingerprints were found. The murder weapon was never identified or recovered.

"The latter admitted meeting the deceased at the tavern on the afternoon of June 16. He testified that after leaving the tavern they drove to another bar in the victim's automobile and then returned to the motel room; that deceased wanted to freshen up and while he was engaged in taking a shower defendant noticed deceased's wallet, removed it from the latter's clothing and quietly left. It is thus conceded that defendant committed a theft of personal possessions. . . ." (*People* v. *Lessard* (1962) 58 Cal.2d 447, 450-451 [25 Cal. Rptr. 78, 375 P.2d 46].)

As a defense, petitioner offered evidence that, if believed, could have established that he boarded a Greyhound bus to Seattle at 9:30 p.m. The victim was found at 11 a.m. the next day. The prosecution contends that the coroner testified that

death occurred about 10 to 14 hours before the 11 a.m. hour of discovery; if the coroner correctly fixed the time, petitioner could have committed the crime and still have taken the 9:30 bus the previous evening.

In a prior proceeding in this court petitioner sought habeas corpus but we denied his petition (Crim. No. 7276, January 3, 1963); the United States Supreme Court denied certiorari on March 25, 1963 (372 U.S. 955 [83 S.Ct. 954, 9 L.Ed.2d 979]). Two months later petitioner applied for habeas corpus in the United States District Court, alleging three grounds not previously set forth in his application to this court. That court denied the petition (No. 41497, May 20, 1963) but on appeal the United States Court of Appeals stayed execution of the death penalty and rendered an order to remand to the district court, which read in part: "The appellant raised three points upon which he has apparently sought no state remedy. The case is remanded to the District Court with instructions to hold the case a reasonable time while appellant secures or attempts to secure a state determination of his new issues." (No. 18686, May 23, 1963. Subsequently, petitioner sought habeas corpus in the Superior Court of Marin County but that court denied the petition in July 1963. (No. 38123, July 26, 1963.)

In the instant proceeding, petitioner alleges as grounds for relief those specified in his petition to the federal court: grounds 3, 4 and 5 listed below, as well as those alleged in his prior petition: grounds 1 and 2 below. The grounds are: (1) That evidence (a shirt) was obtained by an illegal search of the apartment occupied by his "estranged" wife; (2) That the jurors were guilty of misconduct; (3) That petitioner's absence from chambers during proceedings which led to the discharge of the juror Bernice Mayerhofer deprived him of his right to be present at all stages of his trial: (4) That the prosecution knowingly presented perjured testimony of Walter M. Ihle that fingerprints of the petitioner were found upon objects in the decedent's motel room and on a knife in the Empire Sales Company in San Francisco; (5) That the prosecution knowingly suppressed material evidence in several particulars.

Additionally, the petition raises issues under *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33].

As his first ground for habeas corpus relief, petitioner alleges that the prosecution introduced illegally obtained evi-

dence, consisting of petitioner's shirt, which exhibited laundry marks similar to those on a shirt found at the scene of the crime. In denying his previous petition for habeas corpus this court rejected petitioner's contention. The United States Supreme Court likewise refused to grant certiorari to our denial of the petition for habeas corpus.

Petitioner's latest effort must similarly fail because he neither has properly raised the contention nor established its inherent merit.

We do not believe that petitioner may at this date employ the writ of habeas corpus to attack the introduction of evidence which allegedly has been illegally obtained. Not only did petitioner's counsel fail to object at the trial to the receipt of the evidence but he stated that he did not object to it and, additionally, did not present the issue on appeal. ▪ A failure to object to the introduction of evidence which defendant alleges was illegally obtained precludes the successful presentation of the issue at the appellate level. (*People* v. *Hyde* (1958) 51 Cal.2d 152, 157 [331 P.2d 42].) ▪ Even if defendant did urge an objection at the trial level and the court allowed the evidence to be introduced, defendant cannot neglect his appeal and seize upon habeas corpus as an alternate remedy.

▪ We have held that in a situation which involves an evaluation of evidence petitioner cannot assert on habeas corpus a contention based upon his version of conflicting evidence. Thus in *In re Dixon* (1953) 41 Cal.2d 756 [264 P.2d 513], petitioner objected to the introduction of the evidence at trial but failed to appeal; we held that he was not "entitled in this proceeding [habeas corpus] to a consideration of claims which are based upon his version of the conflicting evidence and which could have been, but were not, raised on appeal." (*Id.* at p. 762.)

▪ Even if petitioner's contentions on habeas corpus do not require such evaluation of the evidence, we do not believe that the writ should serve as the means of attack upon a final judgment because of the introduction of evidence allegedly secured in violation of the Fourth Amendment. We hold that for the reasons stated by Justice Traynor in his concurring opinion in *In re Harris* (1961) 56 Cal.2d 879 [16 Cal. Rptr. 889, 366 P.2d 305], defendant may not collaterally attack a final judgment upon the ground that the trial court has accepted evidence which assertedly has been obtained illegally. Nor do we believe that *Mapp* v. *Ohio* (1961) 367 U.S. 643 [81

S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933], compels a different result; the United States Supreme Court in that case said: ".... state procedural requirements governing assertion and pursuance of direct and collateral constitutional challenges to criminal prosecutions must be respected." (*Id.* at p. 659, fn. 9.)

 Furthermore, even if petitioner's point were properly before us, we doubt its merit. In the husband's absence, the officers could reasonably conclude that the wife could properly consent to a search of the property in the home; petitioner's present allegation of an "estrangement" between them does not destroy the consent. In *People* v. *Carter* (1957) 48 Cal.2d 737, 746 [312 P.2d 665], we stated: "When the usual amicable relations exist between husband and wife (cf. *Kelley* v. *State,* 184 Tenn. 143 [197 S.W.2d 545, 546]), and the property seized is of a kind over which the wife normally exercises as much control as the husband, it is reasonable to conclude that she is in a position to consent to a search and seizure of property in their home."

Petitioner's allegation that he was "estranged" from his wife affords no justifiable distinction from *Carter*. *Kelley* v. *State, supra,* cited in *Carter* by way of comparison, illustrates a different situation in which a gross breach of amicable relations there manifest serves as a ground for distinction. In *Kelley* defendant and his wife quarreled; she then called the police; she told them of defendant's illegal activities; she invited them to their home; there, the police seized the evidence introduced at trial. In view of the obvious hostility between husband and wife the Tennessee court held the wife could not effectively consent to the search and seizure. The record in the case before us shows no such overt antagonism. Beyond the petitioner's bare allegation that the police gained entrance to the apartment "under color of police authority" he alleges no specific facts to demonstrate that the wife did not freely consent to the seizure.[1] (*In re Swain* (1949) 34 Cal.2d 300 [209 P.2d 793].)

Despite its broad language, we do not believe that *Stoner* v. *California* (1964) 376 U.S. 483 [84 S.Ct. 889, 11 L.Ed.2d 856], compels a ruling that the wife here could not consent to the

---

[1]The question of the wife's consent illustrates the inherent difficulty of determining such a matter on habeas corpus. This court lacks any record disclosing the facts of the issue; we cannot examine any transcript to determine if substantial evidence would support such a finding. To make such a finding now is an even more aggravated impossibility because at this date the wife is no longer living.

search. In *Stoner* the United States Supreme Court held that a hotel clerk could not consent to a search of a room occupied by a guest. Obviously the authorization, control and relation of a clerk, as to the occupant of a room, basically differs from that of a husband to a wife. In the present case, defendant's wife, who normally exercises as much control as the husband over the article seized, consented to the search.

As his second ground for habeas corpus, petitioner alleges that the jurors at his trial were guilty of misconduct and bias. Yet petitioner tendered this contention, based on substantially the same facts as are now asserted, in his motion for a new trial, in his appeal, in his prior petition to this court for habeas corpus as well as in his subsequent petition for certiorari in the United States Supreme Court. Petitioner, as we shall explain, fails utterly to establish this basis for a writ of habeas corpus.

As in his previous proceedings, petitioner relies upon the averments of an affidavit of Bernice Mayerhofer, a juror whom the court discharged before the case went to the jury. This affidavit, filed in support of the motion for new trial, stated that the jurors, before reaching a verdict, engaged in prejudicial misconduct in discussing the case; several members of the jury allegedly stated that petitioner was a murderer and that they would listen to no further evidence on his behalf; another juror allegedly read an inaccurate newspaper account to the effect that petitioner had confessed to a theft. The affidavit narrates various other claimed acts of misconduct.

The trial court, however, found against petitioner as to such alleged misconduct. In reaching its ruling denying the motion for new trial, the court rested upon the affidavit of John Curley, the foreman of the jury, stating that ''during the trial and before deliberation affiant did not hear any juror or jurors discuss the guilt of the defendant,'' or ''any juror express any opinion that the jury was prejudiced,'' and that the jury deliberated only upon the evidence presented to it. In our opinion upon petitioner's automatic appeal we carefully analyzed and adjudicated the specific issue petitioner now tenders. (*People* v. *Lessard* (1962) 58 Cal.2d 447, 453-455 [25 Cal.Rptr. 78, 375 P.2d 46].) We have noted that habeas corpus will not lie as a substitute for an appeal nor as a second appeal. (*In re Winchester* (1960) 53 Cal.2d 528, 532 [348 P.2d 904].)

As his third ground, petitioner contends that he was deprived of the right to be present when the judge held a

private conference with one of the jurors, the above-mentioned Bernice Mayerhofer, concerning her request to be excused because of emotional distress. Petitioner argues that his absence from this conference ipso facto violated his constitutional right to be present at all stages of his trial. As an alternate contention, he asserts that the judge improperly neglected to inquire into the reason for Mrs. Mayerhofer's request, which, he alleges, emanated from the coercive pressure of two other jurors.

During the trial the bailiff informed the judge that Mrs. Mayerhofer had become mentally and physically distressed and had told him that she could not continue as a juror. The judge then asked the district attorney and Mr. Harper, petitioner's counsel, if they would stipulate to excuse the juror; Mr. Harper refused. Both counsel then agreed to allow the judge, outside of their presence, to question Mrs. Mayerhofer in his chambers. Although the judge interrogated her as to the reasons for her request, which she specified as emotional difficulties and inability to reach a decision, Mrs. Mayerhofer did not allude to any attempt by external pressure to influence her. The judge informed her that if she wished to be excused she should present a doctor's certificate specifying her condition. Upon her submission of such a statement[2] on the following day the judge discharged her in open court in the presence of all parties.

Since petitioner's absence from chambers bore no reasonable substantial relation to a full opportunity to defend himself, it did not impair his right to a fair trial. Although a defendant who is criminally accused has the right "to appear and defend, in person and with counsel" (Cal. Const., art. I, § 13) and although section 1043 of the Penal Code provides that the defendant in a felony case "must be personally present at the trial," the decisions limit this requirement to the situation in which defendant's presence bears a "reasonably substantial relation to the fullness of his opportunity to defend against the charge." (*People* v. *Abbott* (1956) 47 Cal.2d 362, 372 [303 P.2d 730].) In *Abbott* we concluded that the absence of the defendant during a proceeding in chambers concerning the discharge of a juror could not have affected his right to a fair trial. Similarly, in the instant case, petitioner does not

[2]A letter from Dr. Jack Gordon, her personal physician, to the judge stated as follows: "This letter will certify that I have examined the above juror this morning and find her in an extremely upset nervous condition. She is experiencing choking sensations, weeps continuously, and when she closes her eyes, sees horrible figures of various kinds. It would be a serious threat to her to continue at the present trial."

suggest any reason why his personal presence would have affected the interrogation of Mrs. Mayerhofer. Moreover, petitioner was present, in open court, when the court dismissed Mrs. Mayerhofer.

Furthermore, petitioner approved the alternative juror substituted for Mrs. Mayerhofer, and, as we pointed out in *Abbott*, a defendant cannot successfully claim prejudice because one juror and not another participated in the case. Finally, any showing as to coercive pressure of other jurors upon Mrs. Mayerhofer could have been presented in her affidavit in support of the motion for a new trial.[3] Consequently, petitioner's third contention is without merit.

As his fourth ground, petitioner claims that his conviction rested on the knowing use of perjured testimony. He alleges that Walter M. Ihle, a police officer, with the knowledge of the prosecution falsely testified that petitioner's fingerprints were found in the victim's motel room and on a knife in the Empire Sales Company, a store near the motel. ■ We appointed Honorable Lilburn Gibson as referee to hold a hearing and render findings of fact relative to this and other contentions raised by petitioner; the referee did so, submitting his report to us. We rely heavily upon his findings; as stated in *In re Rose* (1965) *ante,* pp. 384, 387 [42 Cal.Rptr. 236, 398 P.2d 428], ". . . these findings are not binding on this court, although they are entitled to great weight. (*People* v. *Johnson,* 61 Cal.2d 843, 845 [40 Cal.Rptr. 708, 395 P.2d 668]; *People* v. *Tucker,* 61 Cal.2d 828, 831 [40 Cal.Rptr. 609, 395 P.2d 449]; *In re Riddle,* 57 Cal.2d 848, 853 [22 Cal.Rptr. 472, 372 P.2d 304]; *In re De La Roi,* 27 Cal.2d 354, 364 [164 P.2d 10]; *In re Marvich,* 27 Cal.2d 503, 516 [165 P.2d 241]; *In re Imbler,* 60 Cal.2d 554, 562 [35 Cal.Rptr. 293, 387 P.2d 6]; *In re Mooney,* 10 Cal.2d 1, 17 [73 P.2d 554])." As we explain hereinafter, we find the referee's findings amply supported by the evidence.

■ At the evidentiary hearing the referee found against petitioner's claim that Officer Ihle testified falsely. In support of his proposition petitioner produced no testimony except his

---

[3]This affidavit, prepared after consultation with petitioner's lawyer, Mr. Harper, was filed on December 27, 1961. In regard to any possible coercion, Mrs. Mayerhofer had only the following to say: ". . . the affiant was at her request, excused from said jury; affiant states that she was upset at that time and also states that she had been advised, on the previous day, by two other jurors, Mrs. Morrill and Miss Burr, that unless she asked to be excused, they, the said two jurors, would call the bailiff and have him advise the judge that she was not in a condition to go on and that they would ask that she be excused."

own that he had never been in the store. But he had also testified that he had never been in the motel, an assertion which directly conflicted with his statement at the trial.

On the other hand, numerous witnesses corroborated Officer Thle's findings that the latent prints upon the knife and upon objects in the victim's motel room coincided with defendant's fingerprints. For example, Dr. Kirk, a criminologist originally hired by the defense, testified that he believed that all of the fingerprints conformed with the prosecution's claims as to them. He read in testimony a letter which he had written to Lessard: ''A study of the fingerprint photographs reveals positive comparisons where they were claimed to be, so that we have, especially in regard to this evidence, no reason not to concur completely with the expert testimony offered during the trial. In addition, we found no fingerprint lifts which were incompatible with the surface from which they were alleged to have come. There is no indication, whatever, that any lift or standard was counterfeited or otherwise improperly represented.''

Moreover, the referee found, after a full and complete hearing, that, due to his many incorrect and inconsistent statements, the petitioner was not worthy of belief. We see no reason to question this conclusion; we accept the referee's findings. Consequently, petitioner's fourth contention must fail.

As a fifth ground, petitioner contends that the prosecution knowingly suppressed material evidence in several particulars. To establish such a charge the cases hold that the petitioner must show that the suppression was deliberate and that the evidence was material.

Our decision in *In re Razutis* (1950) 35 Cal.2d 532, 535 [219 P.2d 15], formulated the first requirement: ''The claim that a conviction was obtained because evidence was deliberately suppressed is similar to the claim that the conviction resulted from the use of perjured testimony. In both cases the essence of the charge is that petitioner has been deprived of his liberty by reason of a deliberate deception of court and jury, and it is incumbent on him to show that there was a material deception and that there was knowledge thereof on the part of the prosecuting officers. . . .''

The requirement as to materiality finds expression in *Brady* v. *Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215]; here the United States Supreme Court held that ''the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective

of the good or bad faith of the prosecution.'' (*Id.* at p. 87.) Moreover, in some circumstances the prosecution must, without request, disclose substantial material evidence favorable to the accused. (*United States* v. *Wilkins* (2d Cir. 1964) 326 F.2d 135; cf. *In re Imbler* (1963) 60 Cal.2d 554, 569 [35 Cal.Rptr. 293, 387 P.2d 6].)

To resolve this issue of suppression of evidence, we referred to the referee the questions set out below; we shall explain why we have concluded petitioner fails to establish under the relevant tests his charges as to these propositions.

The questions are: (a) Were Mr. and/or Mrs. Kruse of St. Louis Park, Minnesota, prepared to testify that they heard the noise of a struggle from decedent's room around 8 :30 p.m. on June 16, 1959; (b) Did any officer connected with the prosecution know that Mr. and/or Mrs. Kruse were prepared to so testify, and if so, who; (c) Were Mr. and/or Mrs. Kruse in the courtroom prepared to so testify; (d) Were any or all of the facts that may be developed under questions ''a,'' ''b,'' and ''c'' above unknown to the petitioner; (e) If a telephone call was made to Evelyn Stella from the room of the decedent, Mazeski, on June 16, 1959, as Evelyn Stella testified, would the fact and time of such call in the ordinary course of business have been recorded on either the motel telephone call sheet or the telephone company's call sheet; (f) If in the ordinary course of business the fact and time of such call would have been recorded on either call sheet, was such entry in fact made; (g) If in the ordinary course of business the fact and time of such call would have been recorded on either call sheet and no such record was in fact made was any officer connected with the prosecution aware of these facts, and if so, who; (h) Did the motel telephone call sheet and/or the telephone company call sheet show a telephone call by decedent to Robert Briggs in Fresno at 6 :30 p.m. on June 16, 1959, and/or a telephone call from Robert Briggs to decedent on the same day at 7 :15 p.m.; (i) If either call sheet contained either such record, was this fact known to any officer connected with the prosecution, and if so, to whom?

In his proposed findings petitioner concedes that questions (a) through (c) must be answered in the negative. He does not even contend in his objections to the referee's findings that the Kruses, who lived in Minnesota, were prepared to testify; he argues only that the Kruses heard ''some noise'' and that the prosecution knew that fact. As to (d), Mr. Harper testified at the reference hearing that he was informed that the Kruses

had heard "some noise" in the victim's room some time prior to 8 :30 p.m., but that he believed this evidence to be harmful to his trial strategy, which involved establishing the victim's death at a later hour in the evening. Petitioner's claim that he, himself, had not been informed of the Kruses' possible testimony is obviously immaterial.

As to questions (e) through (g), the referee found that the police did know that the motel records did not indicate any local call from the victim's room and that, if Evelyn Stella had actually received a call from that room, it would, in the ordinary course of business, have been recorded. These findings, however, hardly attain substantial materiality. At the trial, Mrs. Stella stated that she received a call from either the victim or the petitioner, but did not definitely identify the location from which the call emanated. Thus the fact that no call was recorded from the victim's room does not as such constitute an impeachment of her testimony.

The most that petitioner could have achieved by establishing the fact that Mrs. Stella did not receive a call would be such impeachment. Yet prior to this point the prosecution had established the fact that she had been engaged in heavy drinking and had thus weakened her testimony. Finally, her testimony tended only to prove that defendant and Mazeski had consorted in the bar, left and gone to the Travel Lodge Motel, facts adequately and previously substantiated by other testimony. In view of the foregoing, petitioner obviously could not have suffered loss of substantial material evidence by the so-called suppression of items (e) through (g).

As to the remaining questions (h) and (i), the referee found that the police gave to defendant's attorneys all relevant information which they requested and which the police possessed; that the telephone company's records showed for the night of the 16th a call to Fresno at 6 :30 p.m. and a return call from Fresno at 7 :15 p.m., and that Mr. Harper knew of these calls. Although the prosecution later discovered the identity of the party calling from Fresno, Mr. Harper did not; petitioner does not, at this time, however, demonstrate how the name could have been of any material value to him at that time.

In addition to the above questions submitted to the referee, petitioner now further accuses the prosecution of four additional instances of "intentional suppression of material evidence." As we explain below, we find no merit in these contentions.

Petitioner initially asserts that the prosecution, in

presenting its case in chief, wilfully omitted testimony relating to the time of decedent's death; that the time of death was material and important because, as we have stated, some evidence indicated that petitioner boarded a bus to Seattle between 9 p.m. and 9:30 p.m. on June 16th, and decedent's body was discovered at 11 a.m. the next day. In this connection, petitioner appears to complain that, since the report of the deputy coroner stated that he estimated that decedent had been dead for a period of 10 to 12 hours, the prosecution should have introduced evidence as to the time from which the deputy commenced his calculations. Yet the defense itself introduced evidence of his estimate; the defense, of course, enjoyed the full opportunity to examine the coroner who testified as to the deputy coroner's report. Nor does petitioner allege that the prosecution possessed evidence establishing the chronological point from which the deputy coroner began his measurements. Petitioner thus fails to establish that the prosecution suppressed material evidence. (*In re Razutis* (1950) 35 Cal.2d 532, 535, 536 [219 P.2d 15].)

Petitioner secondly asserts that the prosecution deliberately neglected to elicit testimony that he was not wearing a pink shirt on June 16th. He states in effect that the color of his shirt assumed a significant role because some evidence suggested that the man who purchased the knife from the store on the 16th wore a pink shirt and because a pink shirt had been found at the scene of the crime. Yet the testimony as to the color of petitioner's shirt could have been easily adduced by the defense; the prosecution's failure to do so cannot constitute a suppression of evidence.

Petitioner thirdly complains of certain statements of the prosecutor in his arguments to the jury. Petitioner alleges that the prosecutor argued that the person who purchased a knife at the store did not know the difference in kinds of knives, but that the evidence failed to show that petitioner lacked such knowledge. Such conduct by the prosecution, however, obviously does not constitute a suppression of evidence.

Finally, petitioner constructs an argument involving the asserted knowledge of the prosecution that a visitor at the motel inquired for the victim at 6 p.m. on the 16th. The argument rests upon the fact that on the day after the killing a police inspector questioned the telephone operator of the motel, Mrs. Gustavson; that she testified at the reference hearing that she told the inspector that a man in "a grey suit with

sort of pinkish specks,'' asked for the victim at 6 p.m.; that she rang the room, and that the victim said: ''I am expecting him.'' She then allowed this unidentified stranger to proceed back to the victim's room. She said that she remembered the time because a guest had just inquired about the 6 p.m. telephone night rates. Mrs. Gustavson also testified that the officers brought a suspect to her for identification; that she told them that the man so presented was taller than the actual visitor; that the former was shabby looking, but the latter neatly dressed.

The prosecution did not tell the defense about these statements. According to Mr. Michos, an attorney for the petitioner subsequent to the trial, the prosecutor, Mr. Giubbini, told him about the statements only after the trial. The prosecutor had then said that he had not further pursued the matter because he felt Mrs. Gustavson to be unreliable and the incident unimportant.

We do not believe, however, that the facts of this case demonstrate a suppression of evidence in denial of due process. Police officers interviewed Mrs. Gustavson the day after the murder, in June 1959. She told them that a man visited the decedent; yet the officers could do little with the general statements which she gave them; they testified, in any event, that they considered the testimony unreliable. Thereafter, almost two years expired before defendant's apprehension and trial. Due process does not require that the officers, two years after the discovery of information, must remember facts that have become stale with time and that they must *sua sponte* disclose them to the petitioner or his attorneys. We cannot find that the prosecution ''deliberately suppressed'' evidence which long before they had considered to be unreliable or that failure to resuscitate such forgotten statements ''was a material deception and that there was knowledge thereof on the part of the prosecuting officer. . . .'' (*In re Razutis* (1950) 35 Cal.2d 532, 535 [219 P.2d 15].)

We turn to petitioner's final argument as to the guilt trial that petitioner's inconsistent statements, which allegedly were obtained in violation of the rule announced in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], could not be used for purposes of impeachment. *In re Lopez* (1965) *ante*, p. 368 [42 Cal.Rptr. 188, 398 P.2d 380], however, holds that the newly formulated right to the asssistance of counsel during police interrogation would not apply to judgments which had become final prior to the date of the decision in *Escobedo*.

Error, however, substantially similar to that committed in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33] occurred during the penalty trial. The trial court instructed the jury that, "A prisoner sentenced to death or life imprisonment may be pardoned or may have his sentence reduced by the Governor." Furthermore, the prosecutor argued to the jury: "The interesting and most important factor, I think, from the statistics themselves and that these people do get paroled, the personnel of the Adult Authority changes, the person in the Governor's office changes from time to time. And all of these things act upon whether or not the person should be released or not."

In *Morse* we held that in the penalty phase of a first degree murder case the possibility "that the instructions as to the judge's and Governor's possible reduction of the death penalty tend to mislead the jury into assuming that the rendition of the penalty initiates a chain of proceedings by the court and the Governor which will achieve a reweighing of the sentence and possibly produce its nullification. The instructions and evidence of the Adult Authority's possible grant of parole invite speculative argument to the jury and surmise by it of the possible improper release of a defendant to society in the future; yet that matter does not truly lie in its province but in the expert judgment of the Adult Authority." (*People* v. *Morse* (1964) 60 Cal.2d 631, 653 [36 Cal.Rptr. 201, 388 P.2d 33].)

We held in *In re Jackson* (1964) 61 Cal.2d 500 [39 Cal. Rptr. 220, 393 P.2d 420], that such error could be reached by collateral attack. Under *People* v. *Hines* (1964) 61 Cal.2d 164, 170 [37 Cal.Rptr. 622, 390 P.2d 398], we must reverse the judgment imposing the death penalty since "substantial deviation from the standards established in *Morse* has occurred."

The writ is granted as to the penalty trial of petitioner. The remittitur issued in Crim. No. 7101, *People* v. *Lessard* (1962) 58 Cal.2d 447 [25 Cal.Rptr. 78, 375 P.2d 46], is recalled and the judgment imposing the death penalty is reversed insofar as it relates to the penalty. In all other respects the judgment is affirmed. Petitioner is remanded to the custody of the Superior Court of the City and County of San Francisco for a new penalty trial.

Traynor, C. J., Peters, J., and Peek, J., concurred.

BURKE, J.—I concur in the affirmance of the judgment in all respects other than as to penalty, but I dissent from the

reversal on the penalty phase for the reason that the record does not support an affirmative finding that in the absence of the subject errors (in the instruction given the jury as to the possibility of a gubernatorial pardon or reduction in sentence and in the argument of the prosecutor to the jury that it should consider the possibility of parole or commutation) a result more favorable to defendant would have been probable and that, therefore, there was a miscarriage of justice.

*People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], relied on by the majority as defining the subject errors, also expressly recognizes the integrity of article VI, section 4½, of the California Constitution. The language of the *Morse* ruling is (pp. 652-653 of 60 Cal.2d) : ''We have no doubt that these errors in directing the attention of the jury to the roles of Adult Authority, judge and Governor, by means of argument, evidence and instruction in the instant case, prejudicially influenced the jury. . . . [A]fter examination of the entire cause, including the evidence, we are of the opinion that it is reasonably probable that a result more favorable to defendant as to penalty would have been reached in the absence of the error.''

The court in the case at bench has made no such finding; the record would not support it. Instead the relevant conclusional statement of the majority is: ''Under *People* v. *Hines* (1964) 61 Cal.2d 164, 170 [37 Cal.Rptr. 622, 390 P.2d 398], we must reverse the judgment imposing the death penalty since 'substantial deviation from the standards established in *Morse* has occurred.' '' It appears irrefragable that the last above quoted language does not constitute compliance with article VI, section 4½, of the California Constitution. It is fundamental that this court cannot, by its own nonconforming declaration, invest itself with jurisdiction in an area specifically denied to it by the Constitution.

Under these circumstances, this court may not set aside the judgment as to penalty. The judgment should be affirmed in all respects.

McComb, J., and Schauer, J.,* concurred.

Petitioner's application for a rehearing was denied March 17, 1965. Mosk, J., did not participate therein.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.