[Crim. No. 5405. First Dist., Div. One. June 22, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. ROLLIS
CROSSLIN, Defendant and Appellant.

Michael Traynor, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci, John P. Oakes and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, P. J.—Two informations, one charging defendant with armed robbery at a market on September 21, 1963, and the second charging him in two counts with attempted armed robbery and assault with a deadly weapon at a liquor store on October 11, 1963, having been consolidated for trial, and defendant having been found guilty on the charges in both informations, defendant appeals from the judgment of conviction sentencing him to state prison for consecutive terms on the robbery and attempted robbery charges and withholding sentence on the assault charge. Defendant's contentions on appeal are as follows: (1) The trial court erred in admitting into evidence a card containing defendant's fingerprints; (2) a statement made by defendant in which he identified himself to the police as Tony Collins and a statement which defendant made for voice identification purposes during a lineup were elicited in violation of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and should therefore not have been allowed

into evidence; (3) several articles taken from defendant's apartment at the time of his arrest were the product of an illegal search and seizure and were therefore inadmissible into evidence; and (4) defendant's convictions for attempted armed robbery and assault with a deadly weapon are not supported by substantial evidence.

## The Record

### The Market Robbery

Dolores Turner, a clerk at Littleman's Supermarket in East Palo Alto, testified that between 4:30 and 5 p.m. on September 21, 1963, while she was working at the checkout stand and waiting on a customer named Mrs. Irish, she noticed a man standing at the side of her cash register holding a gun; that the man told her to give him all the money out of the cash register and the cash box or he would shoot her; that Mrs. Turner took the money from her cash register and cash box, put it in a small bag and gave the bag to the man, who then left the store after telling Mrs. Irish and Mrs. Turner not to move or to say anything until he had gone.

Mrs. Turner described the person who had robbed the market as between 25 and 27 years old, very neat in appearance, with large eyes, gold in the middle of his teeth, "processed" hair, and a mustache; further testified that on the day of the robbery this man had been in the store at least two times before the robbery occurred and on each occasion had bought a can of Country Club beer; and testified that prior to the day of the robbery she had often seen the same man in the store and on one of these occasons the man had purchased a can of Country Club beer and had returned to the store about 15 minutes later and asked to exchange the can as the first can had gotten warm. Mrs. Turner further testified that after the robbery she saw the robber in the store on two occasions, once in October 1964 and the other time in January 1965; that on the former occasion she was working at one checkstand and she saw the robber go through another checkstand; that she and the robber stared at each other for a moment and the robber then came over and checked out at her stand; and that she reported both incidents to the police.

Mrs. Ruby Irish, who testified that she was at Mrs. Turner's checkstand at the time of the robbery, corroborated the testimony of Mrs. Turner concerning the details of the robbery. In addition, Mrs. Irish described the robber as a young Negro man who was very neat and clean in appearance, wore

a mustache, and was dressed in an olive-green sweater, light shirt, dark trousers and black shoes. Both Mrs. Irish and Mrs. Turner identified defendant as the person who had robbed the market on September 21, 1963. In addition, when shown photographs depicting five male Negroes, both Mrs. Irish and Mrs. Turner testified that these photographs represented the persons who were present in a lineup which they had viewed at the San Mateo County sheriff's office subsequent to the robbery and that the photograph of defendant appeared to be that of the person who had robbed the market.

*The Attempted Robbery and Assault at the Liquor Store*

Mrs. Rose Ferrando testified that at around 2 p.m. on October 11, 1963, while she was working at Charlie's Liquor Store at 2380 Cooley Street in East Palo Alto, a man placed a 12-ounce can of Country Club beer on the counter and ordered her to open the cash register; that there then followed a dialogue between the parties which culminated in the man's telling Mrs. Ferrando that he would shoot her if she did not do as he told her; that Mrs. Ferrando still refused to comply with the man's order, whereupon the man shot her in the leg; that the man then went to the front door of the store to close the door and came back to the cash register; that at this point a scuffle ensued and the man struck Mrs. Ferrando on the head; that Mrs. Ferrando then ran outside and called for help, the man meanwhile leaving the store by a back door. Mrs. Ferrando's daughter, Joanna, testified that on the afternoon of October 11, 1963 she was in the rear of the store washing dishes when she heard gunshots in the front of the store and came forward to see what was happening; that when she arrived at the front of the store she heard the man order her mother to open the cash register; that as the man came around the counter and attacked her mother, Joanna stepped on the alarm which signalled for the police.

Mrs. Ferrando described her attacker as a very neat-looking, well-mannered Negro, who was short and had big, black eyes. However, when asked to identify defendant as her attacker she stated that defendant's eyes were similar to those of her attacker but that she did not know if defendant was the attacker. Joanna, who had viewed a lineup subsequent to the attempted robbery, testified that she did not recognize defendant by his features but did recognize his voice when he said, ''This is a hold up.'' When asked if she could identify defendant as the assailant Joanna testified that she was not

certain that he was the man and further stated that she had noticed his eyes which were quite large.

Testimony identifying some fingerprints on the Country Club beer can left by the assailant at the liquor store as those of defendant was adduced as follows: Wesley Blum, a deputy sheriff who went to the liquor store in response to a radio call, testified that from the time he arrived at the store until the arrival of Don Harding, a criminologist for San Mateo County, Blum did not allow anyone to touch the beer can which was sitting on the counter. Harding testified that when he examined the beer can at the liquor store he found several latent fingerprints on the can; that he took the can to the laboratory for further examination; and that by comparing the fingerprints lifted from the can with fingerprints on a card which was reputed to contain defendant's fingerprints, he determined that defendant had handled the can. Harding further admitted that he found other prints on the can and could not determine when defendant had handled the can or whether he was the last person to handle the can.

Concerning the fingerprints on the card which were used for comparison with the fingerprints on the can, the testimony was as follows: The card, which was introduced into evidence, purported to show defendant's fingerprints as taken by M. Gunderson on January 23, 1965. According to the testimony of Donald Hartnett, a captain with the San Mateo sheriff's office, this card was part of the records of the San Mateo County sheriff's office. Hartnett further described in detail the fingerprinting system used by the sheriff's office: He described the cards and the method by which they were created, maintained, and filed; he also explained the meaning of certain numbers and entries appearing on the card; in addition he testified that the card in question was prepared in the usual course of business; and finally he stated that he knew the fingerprints on the card were those of defendant because he had compared them with another set of defendant's prints which he had taken himself at a later date.

## The Arrest

Sergeant Henry Crossfield, a detective with the San Mateo County sheriff's office, testified that he was assigned to investigate the armed robberies at the liquor store and the market; that this investigation led to the arrest of defendant under the authority of an arrest warrant. Crossfield further testified that at the time he and several other officers went to

defendant's Redwood City apartment to arrest defendant, they found him in bed; that when asked for his name or identification defendant stated that his name was Tony Collins and that he had identification in his wallet, which was on the dresser; that the officers searched the wallet for identification and found an identification card from Stanford Research Institute and a temporary California driver's license both bearing the name Tony Collins; that after advising defendant of his right to counsel and his right to remain silent, Crossfield again questioned defendant about his identity but defendant continued to maintain that his name was Tony Collins and that he had never gone under the name of Rollis Crosslin; that the officers then searched defendant's apartment and discovered a marriage certificate bearing the name Rollis Crosslin; and that when confronted with this certificate defendant admitted his true identity.

*The Defense*

Defendant took the stand on his own behalf, denied the charges, and testified as follows: He and his present wife had lived in Redwood City at the time of the robberies and during this time he had shopped frequently at Littleman's Market and Charlie's Liquor Store. In October 1963 defendant and his wife moved to San Francisco where they lived until January 1964, at which time they moved to Oklahoma. After defendant returned to California in September 1964 he shopped numerous times at Littleman's Market in East Palo Alto and saw Mrs. Turner there several times. Defendant also testified that he normally drank Country Club beer and that he could have touched the can which was found on the counter in the liquor store because he took a can or two out of the cooler and then placed them back, but that he did not recall when that might have occurred. Finally, defendant testified that he had used the name Tony Collins when he was an entertainer and also when he was in Oklahoma.

### Admissibility of the Fingerprint Card

In arguing that the fingerprint card purporting to show defendant's fingerprints as of the date of his arrest was erroneously admitted in evidence, defendant makes two distinct contentions: first, that the card was hearsay testimony and its admission was not justifiable under any of the exceptions to the hearsay rule; and second, that the effect of the card was prejudicial because of the reference contained on the card to charges against defendant which are unconnected with

the instant proceedings.[1] We consider first the question of whether the fingerprint card, which clearly constituted hearsay evidence, was admissible under an exception to the hearsay rule. In this regard the Attorney General argues that the card was admissible under the "business records" exception to the hearsay rule codified in Code of Civil Procedure section 1953f.[2] As pointed out in *People* v. *Gorgol,* 122 Cal. App.2d 281, 296 [265 P.2d 69], the Uniform Business Records as Evidence Act, of which section 1953f is a part, "is based on the recognition that records made and relied upon in the regular course of business may be regarded as trustworthy without verification by all the persons who contribute to them."

The object of the statute is, of course, to eliminate the necessity of calling each witness and to substitute the record of the transaction instead. (*People* v. *Gorgol, supra,* at p. 296; *Nichols* v. *McCoy,* 38 Cal.2d 447, 449-450 [240 P.2d 569]; *Cole* v. *Ames,* 155 Cal.App.2d 8 [317 P.2d 662].) The foundation for admitting the record is properly laid ". . . 'if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.' (Code Civ. Proc., § 1953f)." (*People* v. *Gorgol, supra,* at pp. 300-301; *People* v. *Grayson,* 172 Cal.App.2d 372, 380 [341 P.2d 820].) "This places a broad discretion in the trial court which will not be disturbed on appeal." (*People* v. *Grayson, supra,* at p. 380; *People* v. *Torres,* 201 Cal.App.2d 290, 295 [20 Cal.Rptr. 315]; *Cole* v. *Ames, supra,* at p. 18.)

The foundation for the introduction of the fingerprint card was laid through the testimony of Captain Hartnett. Hartnett testified that he had been taking fingerprints since 1939 and that he had set up the fingerprint section when the jail was opened in the Hall of Justice. He identified the card in question as of the type used only by the San Mateo County sheriff's office. He then proceeded to relate how these cards were prepared, what the various numbers signified, and who prepared them. He also stated that he had checked the

---

[1]Defendant objected to the admissions of the fingerprint card at the trial on the grounds of hearsay and prejudicial effect.

[2]Code of Civil Procedure section 1953f, as in effect at the time of the trial in the instant case, provides as follows: "A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

date and numbers on the card and found the card to be in the correct location and sequence. Finally, he stated that the card was prepared in the normal course of business on January 23, 1965, this being the same date that defendant was arrested.

From the above it is apparent that it was quite proper for the trial court to conclude that ". . . the sources of information, method and time of preparation were such as to justify . . . [the records] admission." (Code Civ. Proc., § 1953f.) The court properly exercised its discretion and its decision must be upheld.

Defendant, in contending that the card was inadmissible, is apparently making the argument that the foundation for its admission was improper in the respect that the person who actually took defendant's fingerprints was not called as a witness. However, in *Gorgol,* we find this language with relation to the admissibility of hospital records under section 1953f: ". . . if a proper foundation is laid, the fact that . . . the particular nurse, doctor or person making the record has not been called, does not preclude their admission." (P. 300.) Similarly, in the instant case since the fingerprint card was verified so as to satisfy the trial court as to its authenticity, the fact that the person who actually took defendant's fingerprints and made this card was not called as a witness is immaterial.

Defendant, relying on the case of *McGowan* v. *City of Los Angeles,* 100 Cal.App.2d 386 [223 P.2d 862, 21 A.L.R.2d 1206], argues that because Hartnett was unable to testify that the fingerprints on the card were actually those of defendant the card was inadmissible. In *McGowan* a document entitled "Blood alcohol determination," which purported to be an analysis of the alcoholic content of the blood of the driver of one of the cars involved in an automobile accident in which the plaintiff's father was killed, was offered in evidence. However, it was held in that case that the trial court properly refused to allow this report into evidence under Code of Civil Procedure section 1953f for the reason that oral evidence by the person who himself prepared the report would be inadmissible since there was no proof adduced at the trial that the blood which this person analyzed for the purpose of the report was actually that of the person whose name appeared on the report. Stated the court, "The statute [Code Civ. Proc., § 1953f] does not change the rules of competency or relevancy with respect to recorded facts. It does not make that proof which is not proof. It merely provides a method of proof of

an *admissible* 'act, condition, or event.' It does not make the record admissible when oral testimony of the same facts would be inadmissible. In the absence of proof that the blood analyzed was the blood of Cox, taken from his body prior to the injection of any fluid therein, oral testimony of the result of the analysis would not be admissible." (At p. 392; cf. *Nichols* v. *McCoy, supra,* 38 Cal.2d 447, at pp. 448-450.)

The principle involved in the *McGowan* case is not applicable to the instant case for the following reasons. Firstly, M. Gunderson, the person who purportedly took the fingerprints, would clearly have been permitted to testify, had he been called as a witness, that he took the impressions of the fingerprints and that these were defendant's fingerprints. This testimony would clearly have been admissible because Gunderson, as the taker of the impressions, would have had personal knowledge that the subject fingerprints were those of defendant. Secondly, there was evidence in the record that the subject fingerprints were actually those of defendant. Hartnett testified that he knew the fingerprints on the card were those of defendant because he compared them with another set of defendant's prints which he himself took at a later date.[3]

 We turn next to defendant's contention that it was error to admit the fingerprint card into evidence because of the fact that the card contained reference to charges against defendant which were unconnected with the instant proceedings. The allegedly objectionable information contained on the fingerprint card appears on the back of the card in space provided for various statistics concerning the person whose fingerprints appear on the front side of the card. On the first line appears "Date 1-23-65" followed three lines below by the following: "Charge 211 PC 11530 H&S 12951-21650 CVC." This last notation appears to have reference to the charges which were pending against defendant at the time his fingerprints were taken on January 23, 1965.[4] These charges, designated by abbreviations recognizable by judges, lawyers, and law enforcement officers, refer, respectively, to the offenses of robbery, possession or cultivation of marijuana, and certain traffic offenses. Aside from the offense of robbery,

---

[3]Of some evidentiary value is the fact that the fingerprint card bears the signature of ''Tony Collins'' as the ''person fingerprinted.'' This was an alias which defendant himself admitted he had used on occasions and was the name he first gave to the arresting officers.

[4]The information charging defendant with the offenses which are the subject of the instant case were filed on February 8, 1965.

the other charges had no connection with the instant case. ▮ Evidence of these charges was inadmissible under the rule that evidence of other crimes is generally inadmissible unless it is relevant for some purpose other than to show disposition to commit crime. (*People* v. *Cancimilla,* 197 Cal. App.2d 242, 252 [17 Cal.Rptr. 498]; *People* v. *Whipple,* 192 Cal.App.2d 179, 186 [13 Cal.Rptr. 378]; *People* v. *Beverly,* 233 Cal.App.2d 702, 720 [43 Cal.Rptr. 743]; Witkin, Cal. Evidence (2d ed.) § 340, p. 299; former Code Civ. Proc., § 2053, now Evid. Code, § 1101, subd. (b).) In the present case it is not contended that evidence of these other charges had any relevancy other than to show disposition to commit crime.

The record discloses that counsel for defendant objected to the admission of the card in its entirety because of the notation thereon of the charges of other offenses. The objection was overruled, apparently on the basis that the admission of the card with the subject notation was not prejudicial.

In *United States* v. *Dressler,* 112 F.2d 972, 976-978, it was held that courts cannot annul the rule requiring the exclusion of incompetent and prejudicial information regarding other offenses of a defendant merely to facilitate the use of finger-print evidence, and that where such information went to the jury room with other exhibits it constituted prejudicial error. The question of prejudicial error was considered in *Lester* v. *State* (Okla. Crim.) 416 P.2d 52, 58, where marks on a finger-print card identifying the defendant as a person who had been arrested for a criminal offense were covered up with cardboard and were not seen by the jury. In holding that there was no reversible error, the appellate court stated the applicable rule thusly: "The introduction in evidence of a fingerprint record containing extraneous material which in itself is incompetent, may or may not constitute reversible error, depending on such factors as whether the material was or was not seen by the jury, or whether the objection thereto, if made, was waived by the defendant." Similarly, in *Moon* v. *State,* 22 Ariz. 418 [198 P. 288, 292, 16 A.L.R. 362], the reviewing court held that it was not error to admit into evi-dence a fingerprint card which also contained the criminal record of the accused where the printing containing such record was covered in such manner as to render such printing invisible.

▮ In the instant case the subject notation was not covered, obliterated or deleted. Although the record does not disclose whether the jury saw the notation, we must assume

that it did since the entire fingerprint card was admitted in evidence and marked as an exhibit. We doubt, however, that even if the jury read the subject notation on the back of the fingerprint card it would have derived any meaning from it because of its abbreviated form. In that form the subject notation was almost meaningless to a layman, and it is doubtful that it would apprise the jury of defendant's criminal record. Moreover, the record discloses that the prosecution offered to stipulate that "those matters be scratched out with a heavy black ink that can't possibly be read." This stipulation was rejected by counsel for defendant on the basis that to do so would call to the jury's attention that "there's something there we don't want them to see." We think that this amounted to a waiver of any objection to the admission of the fingerprint card, particularly since the objection went to the card in its entirety and not to the extraneous material. In our opinion the procedure approved in *Lester* and *Moon* is a proper one and one that permits the retention of relevant evidence while excluding that which is irrelevant and prejudicial. Under all of the circumstances, therefore, we perceive no prejudicial error.

### Alleged Violations of Escobedo and Dorado

██ Relying on the cases of *Escobedo* v. *Illinois, supra,* and *People* v. *Dorado, supra,* defendant contends that (1) the statement which he made to Sergeant Crossfield at the time the latter came to defendant's apartment to arrest defendant, which statement consisted of identifying himself as Tony Collins, was improperly admitted into evidence because defendant was not advised of his right to counsel and his right to remain silent prior to making this statement; and (2) evidence concerning the fact that Miss Ferrando identified defendant's voice in a police lineup when she heard him say "This is a holdup" was similarly inadmissible because defendant was not advised of his rights prior to making this statement. Since the record reveals that defendant at no time during the trial objected to the introduction of this evidence and since the instant case was tried after the decisions in both the *Escobedo* and *Dorado* cases, it is clear that defendant is precluded from raising error on appeal as to the admissibility of this evidence. (*People* v. *Palmer,* 236 Cal.App.2d 645, 650 [46 Cal.Rptr. 449]; *People* v. *Almond,* 239 Cal.App.2d 46, 49-50 [48 Cal.Rptr. 308]; *People* v. *Sanchez,* 239 Cal.App.2d 51, 55 [48 Cal.Rptr. 424]; Witkin, Cal. Criminal Procedure (1965 Supp.) § 361 N.)

## Voice Identification

█ Defendant argues that voice identification such as that involved in the instant case based on words like those used in the crime involved is unconstitutional on the basis that such activity violates the privilege against self-incrimination. In *United States* v. *Wade,* 388 U.S. 218, 221-223 [18 L. Ed.2d 1149, 1154, 87 S.Ct. 1926], recently decided, it was held that placing a defendant in a police lineup and having him repeat a phrase used by the culprit at the time of the commission of a robbery does not violate the defendant's Fifth Amendment privilege against self-incrimination upon the rationale that such activity involves no compulsion of the accused to give evidence having testimonial significance. (See *Schmerber* v. *California,* 384 U.S. 757, 761 [16 L.Ed.2d 908, 914, 86 S.Ct. 1826].)

█ The holding of the *Wade* case also disposes of defendant's contention in the instant case that the voice identification evidence was admitted in violation of the *Escobedo-Dorado* rule, even if an objection had been made on the basis of this rule. According to *Wade,* the *Escobedo* rule safeguards the privilege of self-incrimination and is not applicable to statements of a non-testimonial nature. Moreover, our own Supreme Court has enunciated this principle in holding that the right to counsel established in *Escobedo* is designed to prevent the use of coercive practices to extort confessions or other incriminating statements and "does not protect a defendant from revealing evidence in other ways." (*People* v. *Graves,* 64 Cal.2d 208, 211 [49 Cal.Rptr. 386, 411 P.2d 114].) "It applies only," said the court in *Graves,* quoting from *Escobedo,* "when 'the police carry out a process of interrogations that lends itself to eliciting incriminating statements,' . . ." (P. 211.) Accordingly, it was held in *Graves* that the obtaining of handwriting exemplars from the defendant after his arrest without advising him of his right to counsel and to remain silent did not violate *Escobedo* or *Dorado.* We think the same rationale is applicable to voice identification, which, as in the instant case, did not elicit incriminating statements from defendant but only requested and secured an identification of his voice.[5]

---

[5]It should be here pointed out that the Supreme Court in *Graves* expressly stated that it did not have to decide whether the defendant could have invoked the privilege against self-incrimination and refused to make the exemplars. This question has now been put to rest in *Gilbert* v. *California,* 388 U.S. 263, 266 [18 L.Ed.2d 1178, 87 S.Ct. 1951], de-

The *Wade* case and *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], do hold, however, "that a post indictment pretrial lineup at which the accused is exhibited to identifying witnesses is a critical stage of the criminal prosecution; that police conduct of such a lineup without notice to and in the absence of his counsel denies the accused his Sixth Amendment right to counsel and calls in question the admissibility at trial of the in-court identifications of the accused by witnesses who attended the lineup." (*Gilbert* v. *California,* 388 U.S. 263, *supra,* 272.) While the case at bench is distinguishable from *Wade* and *Gilbert* in that the lineup identification occurred *prior* to the time defendant was informed against and *prior* to the appointment of counsel to represent him, we need not decide whether the critical stage of the criminal prosecution discussed in *Wade* and *Gilbert* had been reached in the instant case because, in any event, the rule of these cases does not apply to the present case. In *Stovall* v. *Denno,* 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967], decided with *Wade* and *Gilbert,* it was held that the rulings of *Wade* and *Gilbert* affect only those cases and all future cases which involve confrontations for identification purposes conducted in the absence of counsel after June 12, 1967, the date each of these opinions was announced. In the present case such confrontation occurred on January 24, 1965.

### Alleged Illegal Search and Seizure

█ Defendant contends that the admission into evidence of his identification card, temporary driver's license and marriage certificate was improper since these items were obtained by means of an illegal search and seizure. The record discloses, however, that defendant did not object to the admission of these articles into evidence nor did he at any time during the trial raise the question of the legality of the search and seizure resulting in the discovery of these articles. Accordingly, it must be deemed that defendant has waived his right to raise the issue of illegal search and seizure, which issue is being raised for the first time on appeal. (*In re Lessard,* 62 Cal.2d 497, 503 [42 Cal.Rptr. 583, 399 P.2d 39]; *People* v. *Clapper,* 233 Cal.App.2d 34, 38 [43 Cal.Rptr. 105]; *People* v. *Washington,* 163 Cal.App.2d 833, 841 [330 P.2d

---

cided with *Wade, supra,* that the taking of such exemplars does not violate the Fifth Amendment privilege against self-incrimination.

67]; see *People* v. *Webb,* 66 Cal.2d 107, 111, fn. 1 [56 Cal. Rptr. 902, 424 P.2d 342].)

▮▮▮ Defendant, however, relying on *People* v. *Kitchens,* 46 Cal.2d 260, 262-263 [294 P.2d 17], argues that an objection on the ground of illegal search and seizure would have been futile and, therefore, that the making of such an objection was unnecessary. *Kitchens* involved a situation where trial was held prior to the decision in *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513], so that the alleged illegally obtained evidence, the admission of which was being objected to for the first time on appeal, was clearly admissible at the time of trial based on the pre-*Cahan* decisions.[6] In holding that the issue of the legality of the search and seizure could be raised on appeal despite the defendant's failure to object to the admission of the evidence in the trial court, the Supreme Court reiterated the rule that ordinarily the admissibility of evidence will not be reviewed on appeal in the absence of an objection in the trial court, but held that this rule did not apply where the law had been changed after the trial so that an objection at trial would have been futile.

As we understand the rule of the *Kitchens* case, it has no applicability in the instant case since defendant, in urging the inadmissibility of the various articles found in defendant's room, has not demonstrated an unforeseen change in the law occurring subsequent to the trial of the present case which would require an application of the *Kitchens* decision. Rather, it appears to us that defendant is asking for a change in an established rule of evidence on this appeal. Specifically, defendant is suggesting that we make certain refinements and distinctions with respect to the rules governing searches and seizures, the adoption of which will bring into play the *Kitchens* rule on the basis that it would be unreasonable to expect that defendant could have anticipated these changes.

The refinements and distinctions urged by defendant are those embraced by some of the federal cases which proscribe evidentiary searches and seizures, whether under the authority of a search warrant or during the course of a search incident to arrest, and which restrict searches and seizures incident to arrest to contraband, instruments of crime, fruits of crime, instrumentalities capable of use for an escape, or inherently injurious objects. (See *Beck* v. *Ohio* (1964) 379

---

[6]*People* v. *Cahan* held that evidence obtained in violation of constitutional guarantees against unreasonable searches is inadmissible, whereas theretofore such evidence had been held to be admissible.

U.S. 89, 91 [13 L.Ed.2d 142, 145, 85 S.Ct. 233]; *Harris* v. *United States* (1947) 331 U.S. 145 [91 L.Ed. 1399, 67 S.Ct. 1098]; *United States* v. *Rabinowitz* (1950) 339 U.S. 56 [94 L.Ed. 653, 70 S.Ct. 430]; *Honig* v. *United States,* 208 F.2d 916; *Gouled* v. *United States* (1921) 255 U.S. 298, 309 [65 L.Ed. 647, 652, 41 S.Ct. 261]; see also *United States* v. *Lefkowitz,* 285 U.S. 452 [76 L.Ed. 877, 52 S.Ct. 420, 82 A.L.R. 775]; *Abel* v. *United States,* 362 U.S. 217 [4 L.Ed.2d 668, 80 S.Ct. 683].) Under this rule, argues defendant, the articles taken from his apartment and introduced into evidence were improperly seized because they were merely evidentiary materials and not instrumentalities, fruits or contraband encompassed by the rule.

Counsel for defendant, although acknowledging in his briefs and at oral argument that this federal rule has been rejected by our California Supreme Court in *People* v. *Thayer* (1965) 63 Cal.2d 635[7] [47 Cal.Rptr. 780, 408 P.2d 108] on the basis that it is not a federal constitutional standard and therefore has no application in California (see *Ker* v. *California* (1963) 374 U.S. 23, 33 [10 L.Ed.2d 726, 737, 83 S.Ct. 1623]; see also *Elder* v. *Board of Medical Examiners* (1966) 241 Cal.App.2d 246, 264-266 [50 Cal.Rptr. 304]), nevertheless asserted his anticipation that the United States Supreme Court was about to put the matter at rest by holding that the search and seizure of objects which are "mere evidence," whether pursuant to a warrant or a warrantless search incident to a lawful arrest, violate the Fourth Amendment. Since oral argument in this case, the United States Supreme Court has in fact put this question to rest, but contrary to defendant's anticipation. In *Warden* v. *Hayden,* 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642], decided on May 29, 1967, the United States Supreme Court held that "The requirements of the Fourth Amendment can secure the same protection of privacy whether the search is for 'mere evidence' or for fruits, instrumentalities or contraband." (P. 306 [18 L. Ed.2d at p. 792].) The high court noted, however, that "There must, of course, be a nexus—automatically provided in the case of fruits, instrumentalities or contraband— between the item to be seized and criminal behavior. Thus in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid

---

[7]Certiorari denied by United States Supreme Court. (384 U.S. 908 [16 L.Ed.2d 361, 86 S.Ct. 1342].)

in a particular apprehension or conviction. In so doing, consideration of police purposes will be required." (P. 307 [18 L.Ed.2d at p. 792, 87 S.Ct. 1650].)

In view of the foregoing it is apparent that there has not been any change in the law of search and seizure subsequent to the trial of this case. Accordingly, there is no merit to defendant's contention that his failure to object to the admission of the evidence was justifiable on the ground that such an objection would have been futile. We are persuaded, moreover, that the search in the present case was a reasonable one since there was a nexus between the items seized and defendant's criminal behavior. Here, the police had an arrest warrant for Rollis Crosslin. The defendant, when confronted with this warrant, insisted that he was not Rollis Crosslin but Tony Collins. Accordingly, the police were justified in seeking evidence which would aid in identifying the culprit they were seeking and in believing that the items found would aid in his identification. Under the circumstances what was said in *People* v. *Smith,* 63 Cal.2d 779, 798 [48 Cal.Rptr. 382, 409 P.2d 222] is applicable here: "Nor were the police required at this point to abandon their search for 'Jim Snyder' or his true identity. They were not compelled to close their eyes to the contents of the house, and their ensuing search was incidental to the purpose of their entry. While in the house, it was not unreasonable for the officers to look about them for evidence that would identify the suspect, thus far known to them only by one of his several aliases, . . ."[8]

### Sufficiency of the Evidence

[11] Defendant contends that the evidence was insufficient to support his convictions for the attempted robbery and assault charges in connection with the liquor store. The basis of defendant's argument is that there was insufficient evidence identifying defendant as the perpetrator of these crimes. Before considering the evidence in the instant case which supports defendant's conviction for these two charges, we note the rule that governs our scope of review. Under that rule a reviewing court cannot weigh the evidence but must instead assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence and must then determine whether such facts are

---

[8]Since the evidence obtained in the instant case was the result of a reasonable search and, therefore, properly admitted, we need not consider the issue raised by the People that, in any event, defendant had given valid consent to the search.

sufficient to support the verdict. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Hillery,* 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382].)

Turning to the evidence tending to show that defendant was the perpetrator of the liquor store crimes, we note initially that evidence indicating that defendant's fingerprints were on the can of Country Club beer which was placed by the robber on the counter at the liquor store. In this regard we note that "Fingerprint evidence is the strongest evidence of identity, and is ordinarily sufficient alone to identify the defendant." (*People* v. *Riser,* 47 Cal.2d 566, 589 [305 P.2d 1]; *People* v. *Massey,* 196 Cal.App.2d 230, 234 [16 Cal.Rptr. 402]; *People* v. *Ang,* 204 Cal.App.2d 553, 555 [22 Cal.Rptr. 455].) Although defendant attempted to explain the presence of his fingerprints on this can by testifying that it is possible that he went to the liquor store, attempted to purchase several cans of beer and put one or two back, this testimony need not necessarily have been believed by the jury since defendant could not specifically recall when he might have done this. Moreover, it seems highly improbable that an unknown assailant would pick up the exact can as was handled by defendant at an earlier time.

Additional evidence identifying defendant as the person who attempted to rob the liquor store and who assaulted Mrs. Ferrando consists of Mrs. Ferrando's description of her assailant as a Negro, very neat looking, well mannered, short and with big, black eyes. Although Mrs. Ferrando could not positively identify defendant as her assailant, this description which she gave of her assailant matched the one given by Dolores Turner, the grocery clerk who was robbed by defendant and who positively identified defendant as the robber. Finally, Joanna Ferrando, who saw her mother's assailant before he left the liquor store and heard his voice, testified that he had large eyes as does defendant and further testified that she recognized defendant's voice at the police lineup as being the same voice as that of the person who held up her mother.

The judgment is affirmed.

Sims, J., and Elkington, J., concurred.

A petition for a rehearing was denied July 14, 1967, and appellant's petition for a hearing by the Supreme Court was

denied September 20, 1967. Schauer, J.,* and Draper, J. pro tem.,† sat in place of Traynor, C. J., and Sullivan, J., who deemed themselves disqualified. Peters, J., Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.